FRANZ JUNGK AND FERDINAND J. FABIAN, APPEL-
    LANTS, v. D. C. REED, G. W. CROPPER, L. HOL-
    BROOK AND S. M. DUGGINS, DEFENDANTS, OF
    WHOM L. HOLBROOK AND S. M. DUGGINS ARE
    RESPONDENTS.

(See opinion on former appeal, 9 Utah, 49, 33 Pac. Rep. 236.)

1. PROMISSORY NOTES.—PRINCIPAL AND AGENT.—WHEN FRAUD OF
    AGENT NOT IMPUTED TO PRINCIPAL.—WHEN FRAUD WILL RE-
    LEASE SURETY.—FRAUD OF MAKER OR HIS AGENT NO DEFENSE

FOR SURETY WHEN PAYEE IS INNOCENT.—On February 20, 1889, S. made an agreement with J. and F., plaintiffs, a firm of brokers, to purchase sheep for them and to share in the profits of the sale of the sheep, and afterwards, on March 7, 1890, entered into another agreement with R. and C., two of the defendants, another firm, from whom he had purchased the sheep, by which he and they were to share the profits and losses as co-partners. At the time of the execution and delivery of the notes sued upon, the relation of S. to each firm was known to R. and C., but was unknown to J. and F., the plaintiffs. On December 24, 1889, R. and C. entered into a contract with J. and F. to deliver a certain number of sheep to them the following summer, and on February 19, 1890, entered into another similar contract for the same purpose. Defendant D. was surety on the first and H. on the second contract. R. and C. having failed to perform these contracts, executed and delivered on August 1, 1890, the notes in suit, which covered moneys advanced on the contracts, as part of the purchase price of the sheep and also the damages agreed upon for failure to deliver the sheep according to the contracts. D. and H., who were ignorant of the relation of S. to both firms, signed the notes as sureties, on account of their liability as sureties on the contracts and for the purpose of continuing that liability. S. had no interest in the notes nor in the corpus of the plaintiffs' property, nor any authority to discharge any obligation payable to plaintiffs. In an action upon the notes against the makers and sureties, *Held, First,* that the relation of S. to plaintiffs did not increase the liability of the sureties, but that his interest with the defendant makers was antagonistic to plaintiffs and a fraud upon them. *Second,* that any fraud that would release the sureties on the notes, must be a fraud upon the part of the plaintiffs. *Third,* that S.'s action and knowledge of his own dealings with the defendant makers cannot be imputed to plaintiffs. *Fourth,* that the plaintiffs were guilty of no fraud in not informing the sureties of the interest of S. with the makers—a matter of which they were ignorant, and hence, the sureties are liable on the notes.

2. PRINCIPAL AND AGENT.—WHEN NOTICE TO AGENT NOT IMPUTED TO PRINCIPAL.—The rule that the knowledge of, or notice to an agent is imputed to his principal has no application to a case where the agent acts in his own interest adversely to that

of his principal, for two reasons; *First,* that he will very likely in such a case act for himself rather than for his principal. *Second,* he will not be likely to communicate to his principal a fact which he is interested in concealing.

3. TERRITORIAL COURTS.—LAW OF THE CASE. — WHEN BINDING UPON APPELLATE COURTS.—Since an appeal lies to the Supreme Court of the United States from the supreme court of the territory in causes involving a sum in excess of $5,000, a decision by the territorial supreme court on a former appeal, in such a case, is not binding, as the law of the case, since that doctrine applies only to the courts of last resort.

(No. 549.   Decided Nov. 6, 1895.   42 P. R. 292.)

APPEAL from the District Court of the First Judicial District. Hon. H. W. Smith, *Judge.*

Action by Ferdinand Jungk and F. J. Fabian against D. S. Reed and G. W. Cropper, as principals, and L. Holbrook and S. M. Duggins, sureties, on certain promissory notes. On a former appeal, 9 Utah, 49, a judgment for defendants was reversed, and a second trial resulted in a judgment for plaintiffs as against the principals, but against plaintiffs as to the sureties. From an order denying plaintiffs' motion for a new trial, they appeal. *Reversed.*

*Messrs. Williams, Van Cott & Sutherland* and *Messrs. Bennett, Marshall & Bradley,* for appellants.

The court instructed the jury that if Holbrook and Duggins *knew* at the time of signing the notes that Scott was a partner with Jungk & Fabian, and also with Reed & Cropper in the contracts upon which they were guarantors, they were bound upon the notes. *If they did not know it, they were not bound upon them.*

The charge of the court is erroneous because: ·

1. It assumes that the fact of Scott's interest in the transaction was a material fact for the sureties to know. The rule of law is:

"That the fact concealed must be one *necessarily* having the effect of increasing the responsibility of the surety or operating to his prejudice, in order that it shall have the effect of a fraud upon him and vitiate the contract." *Comstock* v. *Gage*, 91 Ill. 328; Brandt on Suretyship, (2 ed.) § 419.

It must be a concealment of some fact or circumstance *immediately affecting the liability* of the surety and bearing directly upon the particular transaction to which the suretyship attaches. Brandt on Suretyship, § 419; De Gol. on Guar. 258, *et seq.* (326.)

But in any event it was a question for the jury whether or not the fact of Scott's interest was a material fact for the sureties to know, and the court erred in assuming in its charge that the fact was material, and thus taking the question from the jury. Thomp. Trials, § 1284.

But we particularly complain of the charge, because:

2. It utterly ignores the question of the plaintiffs' participation in the concealment of the facts from the sureties. In order that the want of knowledge of a material fact by the sureties may operate as a defense there must have been a *fraudulent* concealment on the part of the creditor. Brandt on Suretyship, § 419; De Gol. on Guar. 158, *et seq.* (326,)

The rules are very clearly laid down by the Supreme Court of the United States, as follows:

"But there is a duty incumbent upon him (the surety). He must not rest supine, close his eyes and fail to seek important information within his reach. If he does this and a loss occurs, he cannot, in the absence of fraud on the part of the creditor; set up as a defense facts then first learned which he ought to have known and considered before entering into the contract. Kerr on Fraud and Mistake, 96.

A fraudulent concealment is the suppression of something which the party is bound to disclose. Kerr, *supra*, 95.

To constitute fraud, the intent to deceive must clearly appear. *Spofford* v. *Newson*, 9 Ired. Law, 507.

The concealment must be wilful and intentional. De Gol. on Guar. & Sur. 366.

The test is whether one of the parties knowingly suffered the other to deal under a delusion. 2 Kent's Com. (Comst. ed.) 643.

The mere relation of principal and surety does not require the voluntary disclosure of all the material facts in all cases. The same rule as to disclosures does not apply in cases of principal and surety as in cases of insurance on ships or lives. *North Brit. Ins. Co.* v. *Lloyd,* 10 Excheq. 533.

In this case a former guarantor was discharged and others taken in his place. The fact of the prior guaranty was not disclosed. The subsequent guarantors made no inquiry, and they were held to be liable. If the surety desires information he must ask for it. The creditor is not bound to volunteer it." *MaGee et al.* v. *Manhattan Life Ins. Co.,* 92 U. S., 93, 98; Brandt on Suretyship, § 419.

So the concealment on the part of the creditor from the surety must be of purpose and of facts which it was his duty' to reveal. 1 Big. Fraud, 601.

The surety generally relies on the principal debtor for his information. He acts *at* his request and not at the request of the creditor, and in ordinary cases the creditor may assume that the surety has obtained from his principal all the information which he requires. 1 Bigelow Fraud, 601.

So a failure of plaintiffs to communicate the fact of Scott's interest with them, if otherwise they were bound to do so, cannot be considered a fraudulent concealment unless they knew or had reason to believe that the sureties were ignorant of this fact. *Bank of Monroe* v. *Gifford* (Ia.), 32 N. W. Rep. 669.

In view of the facts of the case, no presumption that the plaintiffs knew or had any reason to believe that the sureties were ignorant of Scott's relations with them can be indulged. That the plaintiffs cannot be held responsible for the failure of the defendants, Reed and Cropper, to

communicate material facts to the sureties, nor even for positive misrepresentations unless they had knowledge thereof or were guilty of fraud. See 1 Bigelow Fraud, 253; *Booth* v. *Storrs et al.*, 75 Ill. 438.

The fact of Scott's connection with the plaintiffs was not such a fact as they were called upon as a duty to disclose to the sureties without inquiry on their part. A surety is not entitled without inquiry to be informed of all the previous dealings between creditor and principal. The test as to whether the disclosure should be made voluntarily is whether there is a contract between debtor and creditor to the effect that his position shall be different from that which the surety might naturally expect. Brandt on Suretyship, § 419, page 612. See, also, 1 Bigelow Fraud, 601-4. *Cowley et al.* v. *People*, 95 Ill. 249-55.

The court refused to give the eighth request to the effect that if the jury believe from the evidence that Scott was a partner with Reed and Cropper at the time the sureties signed the guaranties on the sheep contracts and the plaintiffs were ignorant of that fact, that Scott's knowledge of the partnership was not to be imputed to the plaintiffs. 1 Bates Partnership, §§ 315, 316, 394, 395, 464, 481; *Irwin* v. *Williar*, 110 U. S. 499.

Scott's knowledge of his partnership with Reed & Cropper was not acquired by virtue of his relationship with Jungk & Fabian but wholly beyond and outside of it. It was not an act within the scope of his relationship with them but inconsistent with it. That this is so seems too clear for argument. His knowledge as to any matter concerning which he was seeking to defraud plaintiffs, and which therefore he would presumably not disclose to them, is not imputable to the plaintiffs and this would be so even if it be held that Scott was a partner of plaintiffs.

One partner is made liable for the acts of another upon the principle that each partner is the general agent of the partnership in all matters within the scope and objects of the partnership business. His power and authority are tested by the law of agency. The liability and limitations of the liability are measured by the nature of the business of the partnership. *Innerarity* v. *Merchants' Nat. Bank,* 139 Mass. 332; *Dillaway* v. *Butler,* 135 Mass. 479; *DeKay* v. *Water Company,* 38 N. J. Eq. 158; *Barnes* v. *Trenton Gas Light Co.,* 27 N. J. Eq. 33; 1 Bigelow on Fraud, 239; *Thompson* v. *Cartwright,* 33 Beav. 178; *Insurance Co.* v. *Minch,* 53 N. Y. 144; *Sharp* v. *Foy L. R.,* 4 Ch. Ap. 35.

The court instructed the jury that the contract of November 20, 1889, between Jungk & Fabian and Scott in law constituted Jungk & Fabian and Scott partners.

In this we thing the court erred. Under the modern authorities a partnership is a question of intention. The old rule that if two persons participated in the net profits of a business, they were partners, has been utterly repudiated by the modern authorities. And whether or not a partnership is established by any particular agreement is to be tested primarily by the question whether or not it was the intention of the parties to effect a partnership, to be determined by their agreements.

By the contract in question there is no element of partnership except the participation in the net profits.

Jungk & Fabian are the sole owners of the capital; they advanced and became responsible for all the funds to carry on the business. Any loss falls upon them alone. Scott is not responsible for any borrowed capital except for a portion of the interest and for the expenses incurred in connection with the sheep contracts. And we insist that this agreement did not constitute a partnership between Jungk & Fabian and Scott but made Scott simply the agent of Jungk & Fabian. *Eastman* v. *Clark,* 53 N. H.

276, S. C. 16 Am. Rep. 192; *Beech* v. *Bush*, 45 Mich. 188; S. C. 40 Am. Rep. 465, 472; 1 Bates on Partnership, §§ 23, 26, 29, 30, 36, 37, 41, page 30; *Newberger* v. *Fields*, 23 Mo. Ap. 631; *Buzard* v. *First Nat. Bank*, 67 Tex. 83; *Donnell* v. *Harshe*, 67 Mo. 170; *Musser* v. *Brink*, 68 Mo. 242.

Now assuming for the sake of this argument simply, that as to the net profits Scott was a partner with Jungk & Fabian yet as to the corpus of the property and as to the obligations payable to Jungk & Fabian alone the so-called partnership agreement gave Scott no authority to discharge the rights of Jungk & Fabian. And when his act claimed to have that effect was in furtherance of a scheme to defraud Jungk & Fabian, it cannot be contended that authority to commit such fraud was given by the contract in question. So Scott's knowledge of his own act was not to be imputed to Jungk & Fabian, there being à presumption that he would not disclose it to them. *Kennedy* v. *Greene*, 3 Myl. & Keene, 699; *In re European Bank*, L. R., 5 Ch. Ap., 358; *In re Marseilles Extension Ry.*, L. R., 7 Ch. Ap., 161; *Cave* v. *Cave*, L. R., 15 Ch. Div. 639.

*Messrs. Brown & Henderson*, for respondents.

The contract of November 20, 1889, between Jungk & Fabian and Scott constituted them partners within every test within the meaning of all the authorities. *Beecher* v. *Bush*, 48 Mich. 188; Story on Part. (7th ed.) §§ 15–17; 1 Bates on Part., 17, 25, 28; *Somerby* v. *Buntin*, 118 Mass. 279; *Duryea* v. *Whitcomb*, 31 Vt. 359; *Clark* v. *Gridley*, 49 Cal. 105; *Wood* v. *Beach*, 23 Wis. 254; *Miller* v. *Price*, 20 Wis. 117.

Jungk and Fabian sent Scott with Reed and Cropper to the sureties personally to obtain their signatures to the

sheep contracts. If Scott was a partner of Jungk and Fabian, he knew it; and if he was a partner with Reed and Cropper, he knew it. The contracts upon their face gave no intimation whatever that such was the fact, and it was carefully concealed from the sureties Holbrook and Duggins. Scott's acts were the acts of Jungk and Fabian, and they are charged with it. It was their duty to inform the sureties of the relation of Scott to both firms. Scott's concealment of this relation was their concealment, and for that reason the sureties are not bound. *Stockwell* v. *U. S.*, 13 Wall. 547-8; *Strang* v. *Bradner*, 144 U. S. 555; *Chester* v. *Dickman*, 54 N. Y. 1; *Durant* v. *Rogers*, 87 Ill. 511; *Lock* v. *Steam*, 1 Met. (Mass.) 560.

It was conceded that Scott was present when the sureties obligated themselves in the interests of the plaintiffs. They had committed to him their interests and he was charged with their duties. That Scott was a partner on both sides of the transaction undisclosed on the face of the paper was certainly out of the ordinary course of things. He had no reason to suppose that the sureties would suspect such a thing. The concealment of any material fact from a surety discharges him. 2 Brandt on S. & G. § 420; Story's Eq. Jurisp. § 324; *Franklyn Bank* v. *Cooper*, 36 Maine, 179; *Peck* v. *Drueet's Adm'rs*, 9 Danna (Ky.), 486; *Doughty* v. *Savage*, 28 Ct. 146.

The authorities hereinbefore cited show conclusively as matter of law Jungk & Fabian were chargeable with Scott's neglect. And it would have been gross error to have instructed the jury that Holbrook & Duggins could only be exonerated by showing Jungk & Fabian had personal knowledge of the concealment. It is enough they are charged with it as matter of law.

Complaint is made of the instruction that if Scott entered into a co-partnership with Reed and Cropper at any time

before the notes were executed, and indorsed by Holbrook and Duggins, that it would be a fraud upon the sureties. It would make no difference at what point of time it was, so far as Holbrook and Duggins are concerned, that the fraud was perpetrated, if it existed at the time the obligation sued on was incurred. If Scott was not a co-partner with Reed & Cropper, at the time the original contracts were entered into and entered into the contract in June afterwards when the writing was made between them (and it is not claimed that it could have been at any other time) that would have been a change in the contract and obligation entered into by the sureties and would have released them.

It is admitted that the evidence was substantially what it was on the first trial, and upon appeal to the supreme court the law of this case was settled. When a case has once been before the supreme court and a new trial is ordered, "and the order is based upon a decision determining the principles of law which govern the action, that determination is final and conclusive; the new trial must be conducted in accordance with the principles thus determined and when thus conducted, no error can be alleged in the action of the court below," it then becomes the law of the case as finally determined and adjudicated. *Leese* v. *Clark,* 20 Cal. 388; *Atty Gen.* v. *Lum,* 2 Wis. 514; 25 Cen. Law. Journal, 297-300; *Burton* v. *Perry,* 34 N. E. 60; *Sanders* v. *Bagwell,* 15 S. E. 715; 23 Am. & Eng. Enc. of Law, 33-36; *Stacey* v. *R. R. Co.,* 32 Vt. 532.

When the supreme court in passing upon a case lays down general principles of law to govern the case, and a new trial is ordered, the parties are at liberty to show a different state of facts on the new trial and they are at liberty to apply new principles of law to the new facts thus developed, but the principles that have been determined in the supreme court become the final judgment in that case.

MERRITT, C. J.:

This is an appeal from a judgment rendered in favor of respondents Holbrook and Duggins in the District Court of the First Judicial District of Utah territory, and from an order denying the appellants' motion for a new trial. It appears from the evidence that the appellants had for many years been partners under the firm name of Jungk & Fabian, doing business as merchandise brokers in Salt Lake City, Utah; that on November 20, 1889, they entered into a contract with S. W. Scott to buy sheep, it being provided therein that all contracts for sheep should be made in the name of Jungk & Fabian, who by their firm name were parties of the first part, and they agreed to furnish the necessary capital. Scott agreed to attend to the buying and receiving of the sheep. Payments for sheep were to be by check of Jungk & Fabian, per S. W. Scott. The contract further provided that the net profits were to be divided equally between Jungk, Fabian, and Scott, —one-third to each,—and that they should "bear, in like proportion, any interest paid on money borrowed, and all expenses whatsoever incurred in connection with sheep contracts." Respondents Cropper & Reed, at the solicitation of Scott, agreed with Jungk & Fabian to sell and deliver to them 5,000 head of sheep, at prices ranging from $2.25 to $2.65 per head. This contract was dated December 24, 1889, and on the signing of the contract Jungk & Fabian paid to Cropper & Reed $500, in a check that was filled out by Fabian, but signed by Scott in the name of Jungk & Fabian, per S. W. Scott. It was provided in the contract that Cropper & Reed should furnish sureties for the performance thereof on their part, and, when such sureties were furnished, should receive an additional sum of $4,500, which should be considered part payment for the sheep. In pursuance of this agreement, Hapgood and Duggins were furnished as sureties, and the

remaining $4,500 was then paid. Thereafter, Cropper &
Reed, likewise at the solicitation of Scott, entered into a
second contract with Jungk & Fabian, by which they
agreed to sell and deliver to Jungk & Fabian an addi-
tional 5,000 head of sheep, at the price of $2.65 per head,
and, on furnishing respondents Duggins and Holbrook
as sureties for the faithful performance of the contract on
their part, received from Jungk & Fabian a check for
$5,000, signed in their name, per S. W. Scott. By the
terms of both these contracts the sheep were to be deliv-
ered in the following July and August.

There is evidence tending to show that, prior to enter-
ing into either of these contracts, Cropper & Reed had
been approached by Scott, who offered to go into partner-
ship with them in furnishing these sheep, and also repre-
rented to them that he could procure the sheep at a less
price than that which they were to receive from Jungk &
Fabian. On the 7th day of March, 1890, the following
written contract was made between Cropper & Reed and
Scott, to wit: "Salt Lake City, March 7, 1890. This
agreement, made and entered into by and between Cropper,
Reed & Scott, as partners, dealing in cattle, sheep, and real
estate. They each one agree with each other to buy and
sell on commission, and share equal in profits and loss on
all real estate and cattle, and expenses of handling the
same, to share in two contracts of sheep, made by Cropper
& Reed to Jungk & Fabian. The said Scott is to divide
all profits made in selling and the said Cropper
& - Reed are to divide all profits in buying,
should there be any, and to work to one
another's interest in the entire business as partners.
Cropper & Reed. S. W. Scott." It appears that neither
Jungk nor Fabian knew of Scott's partnership with Crop-
per & Reed, but that Cropper at least knew that Scott
was interested with, or the agent of, Jungk & Fabain in

the matter of purchasing sheep, and Reed also knew this fact before the execution of the notes sued on. Cropper & Reed failed to furnish the sheep as required by the contract, the price of sheep having materially risen between the date of the contract and the date when the sheep were to be delivered. After such failure they had a partial settlement with Jungk & Fabian, at which it was agreed between them that Jungk & Fabian had been damaged by their failure to fulfill said contract in the sum of $5,000, which sum, together with the $10,000 theretofore received by Cropper & Reed, made the total amount due to Jungk & Fabian at that time $15,000. In partial payment thereof, Cropper & Reed paid and delivered to Jungk & Fabian money and checks aggregating $3,062.50; sheep, at the contract price, amounting to $1,075.40; a note executed by S. W. Scott to Cropper & Reed, $600; a further check, drawn by Eliza Moody on Deseret Savings Bank, $1,200,— total, $5,937.90. At the same time it was agreed the balance should be settled in notes, and a short time afterwards the following notes were executed in pursuance of such settlement: First, the three notes sued on, made by D. C. Reed and G. W. Cropper, and endorsed by L. Holbrook and S. M. Duggins, aggregating $7,000; second, a note made by D. C. Reed and G. W. Cropper, and indorsed by H. F. Hapgood, for $500; third, a note made by D. C. Reed, G. W. Cropper, and S. W. Scott for $1,500. The indorsers on the notes were sureties on the contracts, and indorsed the notes as a continuation of their liability on the contracts. The note indorsed by Hapgood has since been paid, but none of the other notes have been paid. This action was instituted upon the three promissory notes, aggregating $7,000 made by the defendants Reed and Cropper and indorsed by Holbrook and Duggins. The makers joined in one answer and the indorsers joined in another. In the respective answers, failure of consideration for the notes, and fraud in obtaining

them, are alleged. The particular fraud relied on by the indorsers is that Scott was a partner on both sides of the contracts, that that fact was unknown to them, and materially increased their risk, and that the failure of the plaintiffs to disclose such fact to them discharges their obligation.

On the trial the court directed a verdict against Cropper & Reed, but as to the sureties, by its fourth instruction, in effect, instructed that if Holbrook and Duggins knew at the time of signing the notes that Scott was a partner with Jungk & Fabian, and also with Cropper & Reed in the contracts upon which they were guarantors, they were bound upon the notes. If they did not know it, they were not bound upon them. This, in effect, instructed the jury that it was the duty of Jungk & Fabian to communicate Scott's double interest to the sureties, and that their failure to communicate that fact avoided the contract of suretyship, unless said sureties had knowledge thereof from other sources.

It may be admitted that Scott's double interest was a material fact for the indorsers to know, but it appears in the evidence that this fact was unknown to Jungk & Fabian, although known to Cropper & Reed. The three notes sued on are admitted by the pleadings to be executed to Jungk & Fabian, not to Jungk, Fabian & Scott. It also appears by the evidence that Scott has no interest therein. Any fraud which would be a defense to those notes, must be a fraud on the part of Jungk & Fabian, and, unless Scott's action and Scott's knowledge of his dealings with Cropper & Reed can be imputed to Jungk & Fabian, they would be under no obligation to disclose what they did not know.

It is not contended that Scott's interest with Jungk & Fabian alone increased the liabilities of the sureties, nor

in any manner interested them. The evidence conclusively shows that Scott was attempting to perpetrate a fraud on Jungk & Fabian. In the contract of March 7, 1890, he agrees to share with Cropper & Reed the profits that would come to him when Jungk & Fabian sold the sheep. His whole arrangement with Cropper & Reed gave him an interest in opposition to his duty as the agent or partner of Jungk & Fabian, and violated the plainest principles of law, that no agent should be permitted to acquire an interest adverse to his duty to his principal. Acting for Jungk & Fabian, it was Scott's duty to procure a contract from Cropper & Reed at the lowest price, and acting for himself, as a partner of Cropper & Reed, it was his interest to obtain from Jungk & Fabian the highest price. If the contract between Jungk & Fabian and Scott constituted Scott a partner with Jungk & Fabian as to the net profits, yet, as to the corpus of the property, and as to the obligations payable to Jungk & Fabian alone, no interest was vested in Scott, nor any authority given him to discharge such obligations; certainly no act of Scott's in furtherance of a scheme to defraud Jungk & Fabian would have that effect. For the same reason, Scott's knowledge of his own scheme to defraud Jungk & Fabian could not be imputed to them, there being a presumption that he would not disclose it to them.

It is a general rule that the knowledge of the agent is to be imputed to his principal, but the exception is as well settled as the rule. The rule has no application to a case where the agent acts in his own interest, adversely to that of his principal. His adversary character and antagonistic interest take him out of the operation of the rule for two reasons. *First*, that he will very likely, in such a case, act for himself rather than for his principal; and, *secondly*, he will not be likely to communicate to his

principal a fact which he is interested in concealing. It would be both unjust and unreasonable to impute notice by mere construction under such circumstances, and such is the established rule of law on this subject. *Frenkel* v. *Hudson*, 82 Ala. 158, 2 South. 758; *Allen* v. *Railroad Co.*, 150 Mass. 206, 22 N. E. 917. As Jungk & Fabian did not know of Scott's interest or contract with Cropper & Reed, and as the law does not impute such knowledge to them, they could not disclose it to the sureties, and are not to be mulcted because they did not perform an impossibility.

But it is contended that on a former appeal of this action the court held otherwise as to the sureties, and that such holding has become the law of the case, and as such is controlling. The particular question of law here discussed was not at all discussed in the opinion on the former appeal. On the former appeal of this case the court decided the question that the interest of Scott with both parties to the sheep contracts was a matter material for the sureties to know; but they nowhere intimate any opinion, on the principle of law here invoked, that Scott's knowledge, obtained in an effort to defraud Jungk & Fabian, was not to be imputed to them, and, from a careful examination of that decision, we cannot see that the court intended to intimate any opinion on that question.

There is another reason why the former decision of this court did not become the law of the case, and that is that this court in this case is not the court of last resort. As to this case, involving as it does a sum in excess of $5,000, the Supreme Court of the United States is the court of last resort, and this stands as an intermediate court. The doctrine of the law of the case is not only restricted to appellate tribunals, but also to the courts of last resort. See *U. S.* v. *Elliot* (Utah), 41 Pac. 720; 1 Herm. Estop. 117, 118; *Lawrence* v. *Ballou*, 37 Cal. 518.

This is well illustrated by the case of *Galigher* v. *Jones,* 129 U. S. 193, 9 Sup. Ct. 335.   That was a case involving the consideration of the duty a broker owes to his principal when he refuses to obey telegraphic instructions from his principal.  On the first appeal of that case to the supreme court of Utah territory, it was decided that the broker was not required to signify his refusal by a telegram, but could do so in the ordinary course of mail.   The trial court having held otherwise, the case was reversed, with instructions to grant a new trial.   The second trial was had before a referee, who found as a fact that the supreme court of the territory had held, under the same facts, and as a matter of law, that the broker was excused if he signified his refusal by mail, and, basing his decision on this as the law in the case, found in favor of the broker. That finding was adopted by the trial court, and affirmed by the supreme court of this territory.   On appeal to the Supreme Court of the United States, however, after reciting the finding and the found fact that the finding was in accordance with the law of the case as established on the first appeal, and after quoting from the decision of this court on the first appeal, the Supreme Court of the United States say that the court was in error, that the broker was but an agent, and was bound to follow the directions of his principal, or give notice that he declined to continue the agency, and where the direction came by telegraph, his notice must be by a like prompt means of communication, and reversed the case.   Of course, that court could only reverse the case if the supreme court of Utah territory on the second appeal committed an error in affirming it.   Appeals lie to the Supreme Court of the United States from final judgments of the supreme court of this territory to correct the errors of this court.   If no error has been committed, the case will not be reversed. If this court, on the second appeal, in *Galigher* v. *Jones,*

was, as matter of law, required to apply the doctrine of the law of the case, it could have committed no error in so applying it, and there could have been no occasion to reverse the action. On principle it would seem that, admitting that the law was erroneously declared on a former appeal of an action, and that such cause could be carried to the Supreme Court of the United States on appeal from the action of this court, there could be no reason in requiring a party to go to that court in order to correct that error; and in this we can see the reason why the law of the case has not been applied to intermediate, but only to courts of last resort.

On the evidence in this record, the last court erred in its fourth instruction to the jury, and the judgment of the court below must be reversed, and a new trial granted; and it is so ordered.

BARTCH, J., concurs.