JUNGK ET AL., APPELLANTS, v. HOLBROOK ET AL., RESPONDENTS.

PROMISSORY NOTES—RELEASE OF SURETIES——CHANGE OF VENUE— CONSTITUTIONAL LAW.

1. Defendants were sureties on a promissory note given by C. & R. to plaintiffs. At the time the note was given, it appears that Scott was a partner and agent of the plaintiffs in the purchase of sheep; that he was also secretly the partner of C. & R. in the sale of the sheep to the plaintiffs; that the relationship, at the time the note in question was given, was known to both plaintiffs and to C. & R., or that the circumstances were such as to give notice to them of the existence of the partnership. The defendants, when they signed as sureties, did not know that Scott was interested as a partner of each firm on the contract concerning which they were sureties, and did not indorse with the knowledge that they were becoming liable for the acts of Scott in the manipulation of the business of the several firms. *Held*, that the intentional concealment of the facts in this case, which, had they been known to the sureties at the time they signed, might have caused them to act differently, constituted such a fraud upon the sureties as to relieve them from liability on the notes. If a material fact connected with a contract of suretyship, and directly affecting the sureties, liability, and which might influence the sureties in entering into the contract, is purposely concealed from the sureties, in the interest of the creditor, such concealment, though no inquiry is made by the sureties, amounts to a fraud upon the sureties, and would discharge them from liability.

2. Plaintiffs were residents of Salt Lake county; defendants of Utah county. The case had already been tried in the First district court of the territory; and under section 3196, Comp. Laws Utah 1888, as amended by Sess. Laws Utah 1896, passed before this case was tried the last time, it was not error in the court to try the case in Utah county, and to deny a change of venue to Salt Lake county.

3. Section 5 of article 8 of the constitution is only prospective in its operation, and does not apply to actions pending when the constitution was adopted.

4. Section 2 of article 24 of the constitution continues in force such territorial laws as were not repugnant to the constitution, and makes them state laws.

(No. 774.   Decided June 16, 1897.)

Appeal from the Fourth district court, Utah county. Hon. A. C. Hatch, *Judge.*

Action on a promissory note by Franz Jungk and another against L. Holbrook and others. Judgment for certain defendants. Plaintiffs appeal. *Affirmed.*

This action was brought against Cropper and Reed, as makers of three promissory notes for $7,000, and against respondents Holbrook and Duggins, as indorsers. The notes were payable in Salt Lake City, where the plaintiffs resided. Respondents resided in Provo, in the First district, where the action was brought. Cropper and Reed resided in Millard county. Holbrook and Duggins answered separately, and set up failure of consideration, and fraud in obtaining their signatures to the notes, by the defendants Cropper and Reed, and fraud and concealment of material facts from them by the plaintiffs in obtaining their signatures as indorsers. It appears that in November, 1889, Jungk and Fabian, the plaintiffs, were partners, and had been engaged in buying sheep. At this time they entered into a partnership agreement with one S. W. Scott, by which Scott was to be an equal partner, but the business was to be carried on in the name of Jungk and Fabian. Money was to be furnished by them, and Scott was to buy the sheep, and pay in checks signed, "Jungk and Fabian, per S. W. Scott." Checks were afterwards issued to Cropper · and Reed

signed in this way. Cropper and Reed were partners, doing a stock business. Scott solicited Cropper and Reed to enter into a contract with Jungk and Fabian for a large number of sheep, for future delivery, but concealed from them, as they claim, that he was himself interested in the purchase, or that he was a partner with Jungk and Fabian. Scott represented to Cropper and Reed that he could contract with Jungk and Fabian at a price much larger than they could be purchased for. He finally proposed a partnership with Cropper and Reed to furnish the sheep to Jungk and Fabian. The contract was to be in their name, and he was to be a silent partner, and interested in the profits. He was to purchase the sheep at a rate that would make a profit, and advised them where he could get the sheep. Under these inducements, Cropper and Reed entered into an agreement with Jungk and Fabian, December 24, 1889, by which they were to deliver in July, 1890, to Jungk and Fabian, 5,000 sheep, at a certain price, in certain places in Southern Utah. In February, 1890, another similar contract was made, under similar circumstances. Scott was interested as a partner on both sides. Cropper and Reed claim that they did not know that he was interested with Jungk and Fabian. On the signing of the contracts, $5,000 was advanced by Jungk and Fabian on each contract, and Cropper and Reed were required to give sureties for due performance on their part. Holbrook and Duggins were offered as such sureties, and, being accepted, Jungk and Fabian directed Scott to go with Cropper and Reed to Provo, as their representative, and get Holbrook and Duggins to sign the guaranties. All these parties went to Provo, solicited and obtained Holbrook and Duggins as sureties for Cropper and Reed, Scott taking an active part in the conversa-

tion and in bringing about the result, but his interest in both sides of the contract was not divulged to the sureties. Holbrook and Duggins were old acquaintances of Cropper and Reed. Scott was a stranger. The partnership contract between Scott and Cropper and Reed, of November, 1889, was not placed in writing until March 7, 1890. It reads as follows: "This agreement, made and entered into by and between Cropper, Reed, and Scott, as partners dealing in cattle, sheep, and real estate; they each one agree with each other to buy and sell on commission, and share equally in profits and loss on all real estate and cattle and expenses of handling the same; to share in two contracts of sheep made by Cropper and Reed to Jungk and Fabian. The said Scott is to divide all profits made in selling, and the said Cropper and Reed is to divide all profits made in buying, should there be any, and to work to one another's interest in the entire business as partners. Cropper and Reed. S. W. Scott." Jungk and Fabian had in the meantime made a contract to sell sheep, relying on their contract with Scott, but the market price had risen above the contract price. Scott failed in performing his agreement with Cropper and Reed, and they with Jungk and Fabian, as agreed. After default, Cropper and Reed and Jungk and Fabian met at Deseret in July, 1890, in the absence of Holbrook and Duggins and Scott; and it was agreed that Cropper and Reed should pay back the $10,-000 advanced, and $5,000 as damages for breach of contract. This sum was paid back except about $8,000. Jungk and Fabian then went to Provo, and presented their claim to Holbrook and Duggins, but no disclosure was at any time made to them of Scott's participation on both sides of the contract. This fact was concealed from the sureties. It was then agreed that Cropper and

Reed should make the three notes for $7,000, and that Holbrook and Duggins should indorse them as they had indorsed the contract, in continuation, and in pursuance of their liability as sureties. The notes were made and endorsed, and are the notes in suit. Cropper testified that he knew or suspected, before the notes were given, that Scott was interested with Jungk and Fabian. Testimony was offered tending to show that Fabian had notice of Scott's duplicity with his firm, and alleged secret dealings with Jungk, his partner, in July. Testimony was also offered tending to show that Jungk and Fabian, or one of them, knew that Cropper, Reed, and Scott owned sheep that were at Oasis in 1890 or 1891, when Fabian was there, before the notes were given; that Cropper and Reed also knew that Scott was buying sheep for Jungk and Fabian; and that Scott acted as agent for Jungk and Fabian in procuring the signatures of Holbrook and Duggins, as their sureties on the sheep contract. Scott's name does not appear on either of the notes or contract, except that Scott indorsed a note of Cropper and Reed for $1,500, given in settlement, also a $600 note, given in settlement, which plaintiffs regarded as equal to Scott's profit in the sheep delivered in the early part of the contract. These notes formed part of the consideration paid plaintiffs at the time of the settlement, outside of the notes in suit. When the three notes fell due, defendants Holbrook and Duggins learned for the first time that Scott was a partner with both Cropper and Reed and Jungk and Fabian, and that he was interested in the contract, to their detriment, and refused payment. A trial was had, and judgment rendered against Cropper and Reed on a former hearing. Defendants Holbrook and Duggins alone appeal.

The court refused to instruct the jury to render a

verdict in favor of plaintiffs, but instructed the jury in effect that if the defendants knew that Jungk, Fabian, and Scott were partners, and that Cropper, Reed, and Scott were partners when they signed the note, they would be bound, and that the burden to show that they did not know it was upon defendants; that if the jury found that, at the time the contracts were guarantied by defendants, that Scott was interested on both sides of the contract, and was a partner of Jungk and Fabian for the purpose of purchasing sheep, and of Cropper and Reed for the purpose of delivering sheep to Jungk and Fabian, and that defendants were ignorant of such relations when they signed the contract and notes, and that Jungk and Fabian, or either of them, knew at the time of such signing by defendants as sureties for Cropper and Reed that Scott was a partner, and interested with Cropper and Reed in the two sheep contracts, and that they concealed such fact from the defendants, the jury should find for defendants; that Scott's knowledge that he was a partner in both partnerships for the purposes named would not be knowledge of or notice to Jungk and Fabian; that the knowledge of Scott could not be imputed to Jungk and Fabian; that if Jungk and Fabian, or either of them, knew or had notice before defendants signed the contract of Scott's interest with Cropper and Reed in the sheep contracts, it was their duty to inform the defendants of the same, and their neglect to do so would be a fraud on defendants, and in that case defendants would not be liable, unless they knew of Scott's interest from some other source; that notice does not mean actual and direct information. If a party is put upon inquiry as to a particular fact, then he is charged in law with whatever inquiry will disclose. The court gave other instructions with reference to the notes being

in continuation of the contract of guaranty; that if, before the contracts were fulfilled, one partner of Jungk and Fabian entered into a partnership with Reed and Cropper, and this fact was purposely concealed from the sureties, and they did not know about it, this would release them upon the guaranty; and, if the notes were simply a continuation of their supposed liability on the original contract, then the defendants are not liable, unless they knew at the signing of the notes of the double relation of Scott to the parties to the sheep contract.

*Bennett, Harkness, Howat & Bradley* and *Williams, Van Cott & Sutherland,* for appellants. -

The notes sued upon in this case, by their terms, were payable at a designated bank in Salt Lake City, in Salt Lake county, and the cause of action upon them arose in that county. *Maxwell* v. *Atchison, etc., R. Co.,* 34 Fed. 286; *United States Graphite Co.* v. *Pacific Co.,* 68 Fed. 442; *Burckle* v. *Eckhart,* 3 N. Y. 132; *Hibernia National Bank* v. *Lacombe,* 84 N. Y. 367; *Hosley* v. *Ins. Co.,* 86 Wis. 463; *Durham* v. *Spence L. R.,* 6 Exch. Cas. 46. See on the constitutional provision: *State* v. *Bates,* 14 Utah 293; *Benson* v. *Anderson,* 14 Utah 334.

The rule is that there must not only be a concealment of material facts by the creditor, but that such concealment must be *fraudulent,* which includes the elements of knowledge of the fact concealed and a wilful intent to conceal it. Brandt on Suretyship, § 419; De Golyar on Guarantee, 158, *et seq.* 326; 1 Bigelow on Fraud, 601; See 1 Bigelow on Fraud, 253; *Booth* v. *Storrs et al.,* 75 Ill. 438; *Ins. Co.* v. *Clinton,* 66 N. Y. 331; *Powers* v. *Clark,* 127 N. Y. 422.

The fact of Scott's connection with the plaintiffs was not such a fact as they were called upon as a duty to

disclose to the sureties without inquiry on their part. Brandt Suretyship, § 419, page 612; see also 1 Bigelow on Fraud, 601-4; *Cowley et al.* v. *People,* 95 Ill. 249-55; *Comstock* v. *Gage,* 91 Ill. 328; Brandt on suretyship (2d ed.) sec. 419; *Bank of Monroe* v. *Gifford,* 32 N. W. R. 669.

*Brown, Henderson & King,* for respondents.

It became an affirmative duty on the part of Jungk and Fabian and Scott to disclose to these sureties that fact. 2 Brandt on S. & G. § 420; Story's Eng. Jur. § 324; *Bank* v. *Cooper,* 30 Me. 179; *Peck* v. *Druets Admrs.,* (Ky.) 9 Danna 486; *Doughty* v. *Savage,* 28 Ot. 146; *Stockwell* v. *U. S.,* 12 Wall. 547-548; *Stray* v. *Brander,* 144 U. S. 555; *Chester* v. *Dickman,* 54 N. Y. 1; *Durrant* v. *Richards,* 87 Ill. 511; *Lock* v. *Bigalow,* 13 Wend. 5.

Under the circumstances of this case knowledge is imputed to the principal whether he personally knew of it or not. *Stockwell* v. *U. S. supra*; *Bush* v. *Moore,* 133 Mass. 198; *Rogers* v. *Plumer,* 102 U. S. 263.

Again, it is a well established principle that where one of two innocent parties must suffer, the loss must fall upon that one who put it in the power of the third party to perpetrate the fraud. Am. & Eng. Enc. of L. 417; *Allen* v. *South Boston R. Co.,* 150 Mass. 207.

MINER, J. (after stating the facts):

This case was twice before the territorial court prior to this appeal. The cases are reported in 9 Utah 49, and 12 Utah 209. Upon each occasion the record discloses Pac. 292. Upon each occasion the record discloses a somewhat dissimilar state of facts. The case now presents a somewhat different state of facts from those presented on the last appeal, so far as appears from the opinion rendered. The first question arises upon the charge of the court as given, and the refusal of

the court to charge as requested.  In some respects the testimony bearing upon the question involved is somewhat indefinite and unsatisfactory.  The jury were the judges of its weight and conclusiveness, and found against the plaintiffs.  There are sufficient facts and circumstances disclosed in the record from which the jury could infer or find that Jungk, Fabian, and Scott were partners for the purpose of purchasing sheep, and that Jungk and Fabian knew at the time, or were chargeable with notice, that Scott was a partner with Cropper and Reed, or at least interested with them in the contracts for the purchase and sale of sheep to them; that Cropper, Reed, and Scott were partners in the purchase and sale of sheep to Jungk and Fabian; that Cropper and Reed knew, or were chargeable with notice, that Scott was a partner or interested in the contract for the purchase of sheep with Jungk and Fabian; that defendants Holbrook and Duggins were wholly ignorant of the double relation existing between Scott and the two firms at the time they signed the guaranty contract and the notes given in pursuance of it, and would not have executed the contract or indorsed the notes had the true state of facts been made known to them by either firm; that the concealment of these facts and circumstances immediately affected the liability of the sureties; that Cropper and Reed and Jungk and Fabian fraudulently withheld from the sureties the true state of facts existing between them and Scott when the indorsements were made; that each of these firms knew that Scott was their partner in the transactions with the other firm, and that the sureties were making the indorsement in ignorance of the relation; that Jungk and Fabian sent Scott, as their agent and representative, to obtain the signatures of Holbrook and Duggins to

the contract; that Scott was their partner at the time; that Jungk and Fabian knew, or were chargeable with notice, that Cropper, Reed, and Scott owned sheep together at Oasis, and had them there when Fabian was present; that Reed and Cropper and Jungk and Fabian, knowing the facts, induced the sureties to sign the notes, and fraudulently withheld from .them the double relation of Scott, as affecting their interest and liability.

If, in obtaining the signatures of these defendants to the contract of suretyship, or as indorsers of the notes made in continuation of their supposed liability, there was any fraudulent concealment on the part of Cropper and Reed and Jungk and Fabian, or either of said firms, of any fact or circumstance within their knowledge, or concerning which they were reasonably chargeable with notice, which materially affected and increased the liability and responsibility of Holbrook and Duggins as sureties or indorsers in those transactions in which they were sureties,. and operated to their prejudice, then the sureties should be discharged. "It has been held that the mere non-communication by the creditor to the surety of material facts within the knowledge of the creditor which the surety should know, although not willful or intentional on the part of the creditor, or with a view to advantage to himself, will discharge the surety." The fraud upon the sureties consists in the situation in which they were placed by the conduct of the other parties, and not on what was passing in their minds, not expressed, but concealed. Upon this subject, Brandt on Suretyship (section 420) says: "It has been held that 'one who becomes surety for another must ordinarily be presumed to do so upon the belief that the transaction between the principal parties is one occurring in the usual course of business of that description, subjecting

him only to the ordinary risks attending it; and the party to whom he becomes a surety must be presumed to know that such will be his understanding, and that he will act upon it unless he is informed that there are extraordinary circumstances affecting the risk. To receive a surety known to be acting upon the belief that there are no unusual circumstances by which his risks will be materially increased, well knowing that there are such circumstances, and having an opportunity to make them known, and withholding them, must be regarded as a legal fraud, by which the surety will be relieved from his contract.'" It is also held that, in order to discharge the surety, the undisclosed information should relate to business which is the subject of suretyship. Story says: "The contract of surety imports entire good faith and confidence between the parties in regard to the whole transaction. Any concealment of material facts, or any express or implied misrepresentation of such facts, or any undue advantage taken of the surety by the creditor, either by surprise or by withholding proper information, will undoubtedly furnish a sufficient ground to invalidate the contract. Upon the same ground, the creditor is, in all subsequent transactions with the debtor, bound to equal good faith to the surety." Story Eq. Jur. § 324; *Bank* v. *Cooper*, 36 Me. 179; Brandt Sur. §§ 419-421; *Comstock* v. *Gage*, 91 Ill. 328; *Bank* v. *Stevens*, 39 Me. 532; *Jungk* v. *Reed*, 9 Utah 49; *Peck* v. *Durrett*, 9 Dana 486; *Pidcock* v. *Bishop*, 1 Law Lib. 87; *Doughty* v. *Savage*, 28 Conn. 146; *Hamilton* v. *Mathews*, 10 Clark & F. 934; *Warren* v. *Branch*, 15 W. Va. 21.

It is said that that "test as to whether the disclosure should be voluntarily made is whether there is a contract between the debtor and creditor to the effect that his position shall be a different one from that which

the surety might expect." *Hamilton* v. *Watson*, 12 Clark & F. 109.

These sureties did not know that Scott was a partner of each firm on the contract concerning which they were sureties, and did not indorse with the knowledge that they were becoming liable for the acts of Scott in the manipulation of the business of the several firms. They signed as sureties for Cropper and Reed, relying upon their integrity, and not as sureties for Cropper, Reed, and Scott. When they signed, they were not informed that a member of both firms had laid plans with each, by which the sureties should be robbed, and Cropper and Reed ruined, for the benefit of one member of the several firms. Nor did the sureties know that Cropper and Reed and Jungk and Fabian were either passive or active agents in such resulting dishonesty. Neither did the sureties know that Jungk and Fabian knew that Scott was interested with Cropper and Reed in the sale of sheep, nor that Cropper and Reed knew that Scott was interested with Jungk and Fabian in the purchase of sheep. If a material fact connected with the contract of suretyship, and directly affecting the sureties' liability, which might influence the sureties in entering into the contract, is concealed from the sureties, or, if knowing the fact, such information is purposely concealed from the sureties, in the interest of the creditor, such conceal- ment, though no inquiry is made by the sureties, amounts to a fraud upon the sureties, and would discharge them from liability. Under all the facts and circumstances shown for the consideration of the jury, they have found the facts against the appellants. We find no reversible error in the instructions of the court, nor is there any error in refusing to give the instructions asked by the plaintiffs.

Prior to the trial, plaintiffs moved the district court for Utah county for an order transferring said cause for trial to Salt Lake county. The motion was based upon an affidavit showing that plaintiffs owned the notes, and had resided in Salt Lake county since they were given, and that they were payable at Salt Lake. The motion was overruled, and an exception taken. The motion is based on section 7 of article 24, and section 5 of article 8, of the constitution. Plaintiffs resided in Salt Lake City when they commenced this action in the First district court in Utah county, January 10, 1891. This case had been tried in that county three times prior to the last trial, which occurred October 9, 1896. The defendants resided in Provo, Utah county. Section 5 of article 8 of the constitution provides, among other things, that all civil and criminal business arising in any county must be tried in such county, unless a change of venue be taken, in such cases as may be provided by law. Section 7 of article 24 of the constitution provides, among other things, that all actions and cases pending in the district and supreme courts of the territory at the time the state is admitted into the Union shall, except as otherwise provided, be transferred to the supreme court and district courts of the state. Section 2 of article 24 of the constitution provides that all laws of the territory now in force, and not repugnant to the constitution, shall remain in force until they expire of their own limitation, or are altered or repealed by the legislature. Section 5 of article 8 of the constitution is only prospective in its operations, and therefore does not apply to actions which were commenced and pending in the territorial district courts when the constitution went into effect. A constitutional provision should not be construed with a retrospective operation, unless that is the unmistakable inten-

tion of the words used. Black, Const. Law, p. 70; End. Interp. St. § 506; *Watt* v. *Wright,* 66 Cal. 202; *Gurnee* v. *Superior Court,* 58 Cal. 88; *People* v. *County Com'rs of Grand Co.,* 6 Colo. 204; *Lehigh Iron Co.* v. *Lower Macungie Tp.,* 81 Pa. St. 484.

Section 2 of article 24 of the constitution continues in force, under the state, such territorial laws as were not repugnant to it, and thereby makes them state laws. This court so held in *Whipple* v. *Henderson,* 13 Utah 374; *Pleasant Val. Coal Co.* v. *Board of Com'rs,* 15 Utah 97. Among the laws of the territory then in force with reference to the place of trial were sections 3193 to 3201, Comp. Laws Utah 1888, which were amended (Sess. Laws 1896, p. 90) by making these sections conform to the new condition of things under the constitution. The territorial act was substantially re-enacted after striking out the words "judicial district," and substituting the word "county." The act was approved and took effect February 17, 1896, before this motion was made. This act provides where cases shall be commenced and tried, and when and where they may be removed for trial. Section 3196 provides that "in all other cases the action must be tried in the county in which the defendants, or some of them, reside at the commencement of the action." When this action was commenced, the plaintiffs resided in Salt Lake, and the defendants in Utah, county. The First district formerly comprised Utah and several other counties. Under the new constitution, Utah county is made distinct by itself. The action was brought in pursuance of law in the proper county under the statute as it then existed. This statute was continued in force until changed by the act of 1896. We are of the opinion that the district court of Utah county properly assumed jurisdiction in this case. We

find no reversible error in the proceedings. The judgment of the district court is affirmed, with costs.

ZANE, C. J., concurs.

HART, District Judge, concurs in the result.