[Sac. No. 2137.    Department Two.—April 9, 1915.]

## AMERICAN NATIONAL BANK OF SAN FRANCISCO (a Corporation), Appellant, v. J. W. DONNELLAN et al., Respondents.

GUARANTY—IDENTICAL FRAUD SET UP IN ANSWER AND CROSS-COMPLAINT —FAILURE TO FIRST TRY EQUITABLE ISSUES — UNPREJUDICIAL IRREGULARITY.—In an action to enforce a guaranty, in which the defendants by answer set up fraud in its procurement as a defense, and also filed a cross-complaint setting up the same fraud and asking the equitable relief of cancellation, it is a mere irregularity, in no way prejudicial to the plaintiff, for the court to submit the whole case to the jury before disposing of the equitable issues raised by the cross-complaint, if it adopts the findings of the jury in favor of the defendants in making its own findings disposing of the equitable issues raised by the cross-complaint.

JUDGMENT—ESSENTIAL FINDINGS SUPPORTING—INSUFFICIENCY OF EVIDENCE—CONTRADICTION IN NONESSENTIAL FINDINGS.—It is only when a judgment rests upon some particular finding for its validity and support that the lack of sufficient evidence to support such finding, or the contradictoriness between two findings, treating of the same essential matter, will necessitate a reversal of the case.

ID.—FINDING THAT GUARANTY WAS PROCURED BY FRAUD—OTHER FINDINGS IMMATERIAL TO SUPPORT JUDGMENT FOR DEFENDANTS.—In such action, clear, full, and explicit findings to the effect that the guaranty in question was procured by the fraud of the guarantee, are sufficient to support a judgment for the guarantor, irrespective of inconsistencies between or the lack of evidence to support findings on the issues raised as to the principal debtor's indebtedness to the guarantee.

ID.—PLEADING—INCONSISTENT DEFENSES MAY BE SET UP.—The defendants in such action were entitled to set up by their answer as many, even inconsistent, defenses as they had. Thus they were entitled to show, if they could, that the contract of guaranty was procured by fraud and therefore void, or, conceding its validity, that no liability had arisen under it by reason of the fact that no indebtedness had been incurred by the principal debtor covered by its terms.

ID.—EVIDENCE OF FRAUD IN PROCURING GUARANTY—FRAUDULENT MISREPRESENTATIONS AND CONCEALMENT OF FACTS BY BANK PRESIDENT.—The evidence in the present case is held sufficient to support the findings that the guaranty sued on was procured through fraud practiced on the guarantors by the president of the bank in whose favor the guaranty was given, and who solicited the guaranty, which fraud consisted both in positive misrepresentations by him as to the legitimate nature of the business in which the principal debtor was engaged, the indebtedness of which the guaranty was designed to cover, and also in the concealment of facts and circumstances affecting the relation of the parties important for the intending guarantors to know and known to such president when he solicited the guaranty and concealed by him.

ID.—DUTY OF CREDITOR TO DISCLOSE FACTS TO INTENDED GUARANTOR—CREDITOR SOLICITING GUARANTY.—Where a surety or guarantor comes forward at the request of the debtor and offers to give the creditor a certain guaranty, the general rule is that no duty of disclosure is incumbent upon the creditor, since, without breach of any faith, he may assume that the debtor himself has informed the intending surety of all that the latter desires to know. His duty, therefore, is performed if he fully and fairly answers the questions put to him, and conceals nothing which he himself believes might influence the surety's conduct. Where, however, the creditor solicits the guaranty, his mere non-communication of circumstances affecting the situation of the parties, material for the guarantor

to know, and within the knowledge of the person obtaining the guaranty, is undue concealment, though not willful or intentional, or with a view to any advantage to himself.

APPEAL from a judgment of the Superior Court of Sacramento County. C. N. Post, Judge.

The facts are stated in the opinion of the court.

Gavin McNab, R. P. Henshall, George W. Mordecai, and Kleinsorge & McKisick, for Appellant.

Devlin & Devlin, for Respondents.

HENSHAW, J.—Upon January 21, 1909, J. W. Donnellan and Marion J. Donnellan, his wife, executed to plaintiff their contract, jointly and severally guaranteeing to plaintiff "the payment of any and all sums of money . . . which is now or may hereafter become due or owing" by their son, Kenneth Donnellan, to plaintiff up to the amount of thirty thousand dollars with interest. Upon this contract of guaranty this action was brought, with an allegation of an indebtedness upon the part of Kenneth Donnellan to the bank in the sum of $37,-605.83. Defendants set up several defenses: That the guaranty was without consideration; that Kenneth Donnellan was not indebted to the plaintiff; that the note of Kenneth Donnellan in the complaint described was not given for an indebtedness of Kenneth Donnellan and was given without consideration; that plaintiff has security ample for all of the alleged indebtedness; that no advances were ever made to Kenneth Donnellan on the faith of the guaranty; that fraud, deceit, and misrepresentation were practiced upon the defendants in the securing of the guaranty. Defendants further pleaded by way of cross-complaint, charging that their guaranty was void for fraud practiced in its procurement, and asking that it be so decreed and that the plaintiff bank be compelled to surrender it for cancellation. Plaintiff in turn, besides answering the cross-complaint, amended its complaint, charging, in effect, that Kenneth Donnellan cloaked his personal transactions under the name of the Kenneth Donnellan Company, a corporation, which was owned and controlled by him; that prior to the thirty thousand dollars guaranty charged upon in the complaint, the same defendants had executed a ten

thousand dollar guaranty to secure past and prospective debts of Kenneth Donnellan, and that upon the execution of the second guaranty plaintiff surrendered to defendants the first guaranty.

A jury was called in, special issues were submitted, and the jury made its findings thereon. The jury also returned a general verdict in favor of the defendants. Because of the equitable defense of fraud and the cross-complaint seeking affirmative relief for fraud, the court itself made its own findings, adopting as a part of them the findings on the special issues which had been submitted to the jury. These findings, summarized, are that there was no consideration for either of the guaranties of the defendants; that no consideration was ever advanced to Kenneth Donnellan by reason of the guaranty of thirty thousand dollars; that the promissory note of Kenneth Donnellan for $37,605.83 set forth in the complaint evidenced the joint indebtedness of the Kenneth Donnellan Company, a corporation, and E. J. Broberg, assistant cashier of plaintiff, and, in addition, an indebtedness of one thousand dollars upon the joint promissory note of Kenneth Donnellan and Marion J. Donnellan, his mother; that there was no forbearance to sue on account of any asserted indebtedness of Kenneth Donnellan as a consideration for the thirty thousand dollars guaranty; that the contract of guaranty was given by the defendants at the solicitation of plaintiff's president, under the following circumstances: "That P. E. Bowles, the president of the plaintiff, did, prior to the execution of the contract of guaranty set out in plaintiff's complaint, and attached as an exhibit thereto, suggest, assert and declare to J. W. Donnellan that the only business that Kenneth Donnellan had transacted with the plaintiff prior to the date of said guaranty was having said bank collect drafts with stock attached thereto; that said business was extensive and it was advisable for the said bank to have a paper in the form of a guaranty so that the bank examiner would be satisfied in case any loss should occur, which loss would be small and the possibility of it remote. That said assertion, suggestion, and declaration of the said P. E. Bowles to said defendant J. W. Donnellan was false and untrue, in this, that prior to the twenty-first day of January, 1909, a speculation in mining stocks was being carried on with E. J. Broberg, who at said time was an officer of the said bank, with Kenneth Donnellan

Company, a corporation; that at the time said declarations and assertions were made by the said P. E. Bowles, president of the said plaintiff bank, to the defendant J. W. Donnellan he knew that said transactions had been carried on in the bank and that great losses had been made; that the loss due at said time was at least the sum of thirty thousand dollars.

"That for the purpose of deceiving and cheating the said defendant J. W. Donnellan and his codefendant Marion J. Donnellan, he the said Bowles, did represent and declare to the said J. W. Donnellan, prior to the making of said guaranty, that no other business had been carried on by said Kenneth Donnellan with said bank except the collection of drafts with stock attached; that for the purpose of lulling said defendant into a sense of security and of preventing him from making any investigation or ascertaining the truth, he, the said P. E. Bowles, did, prior to the making of said guaranty, persuade and induce one Kenneth Donnellan, who knew all of said facts, not to communicate said facts to the said J. W. Donnellan; that the said Kenneth Donnellan is the son of said J. W. Donnellan.

"That P. E. Bowles, as president of said bank, by artifice, deceit and fraud induced the said Kenneth Donnellan to abstain from seeing his father on the day that said defendant J. W. Donnellan came from Sacramento to San Francisco to meet the said P. E. Bowles, which said meeting resulted in the guaranty set out in plaintiff's complaint; that the said defendant J. W. Donnellan was induced to come to San Francisco by a telephone received from one E. J. Broberg some time in the month of January, 1909, prior to the making of the guaranty aforesaid.

"That for the purpose of inducing the said Kenneth Donnellan not to inform his father of the truth or to inform him of the losses the bank had sustained as aforesaid, he, the said P. E. Bowles, promised the said Kenneth Donnellan that he would give to the said Kenneth Donnellan sufficient business, as a stockbroker, from said bank and from other institutions controlled by said P. E. Bowles that would be sufficient to pay off such indebtedness within one year from date, and he also promised the said Kenneth Donnellan that he would give him sufficient business to enable the whole of said indebtedness to be paid; that the said P. E. Bowles made said promises without the intention of performing them, or any of them, and

made said promises for the purpose of inducing the said Kenneth Donnellan to refrain from informing his father of the truth and of informing him that said loss had already been occasioned;'' that the guaranty of thirty thousand dollars thus secured on the twenty-first day of January, 1909, was preceded by a ten thousand dollar guaranty secured in December, 1908; that the false representations and concealments in the securing of the ten thousand dollars guaranty of 1908 were substantially the same as those employed in securing the guaranty of January, 1909, saving that they were made by Broberg, the assistant cashier of the bank, on behalf of the bank, instead of by its president; that Kenneth Donnellan did not own all of the stock of the Kenneth Donnellan Company; that Kenneth Donnellan was not engaged in business individually under the form, guise, or cloak of the Kenneth Donnellan Company; that the defendants did not know, nor did either of them know, that Kenneth Donnellan was engaged in business for himself under the name of Kenneth Donnellan Company, and that such was not the fact. The court concluded that there was no consideration to the defendants, or either of them, for the guaranty; that the indebtedness described in the complaint was not the indebtedness of Kenneth Donnellan, save and except the one thousand dollars not covered by the guaranty; that both guaranties were procured by fraud and deceit; that plaintiff should recover nothing and that defendants were entitled to have the thirty thousand dollars guaranty delivered up to be canceled. Judgment was entered accordingly and plaintiff appeals from that judgment, bringing up the evidence for review under a bill of exceptions.

Appellant's first complaint is a general one,—namely, that the court erred in submitting the whole case to the jury before disposing of the equitable issues raised by the cross-complaint. At the most, however, this complaint amounts to but a technical objection to the order of proof. Defendants might have rested their defense by charging the fraud in their answer, without a cross-complaint. (*Field* v. *Austin*, 131 Cal. 379, [63 Pac. 692].) Having been brought into court to respond to their guaranty, their answer that it had been procured by fraud, if successfully established, would have given them full and complete relief. It would have effectuated an avoidance and cancellation of the contract by

judicial decree as completely as it would have been canceled under their prayer for affirmative relief in their cross-complaint. But conceding the general rule that equitable defenses are first to be disposed of and that the merits of an equitable cross-complaint should first have been determined before the submission to a jury of the issues raised in the action at law, yet this irregularity, at the most, was but an irregularity in no way affecting the substantial rights of appellant. For even upon these equitable issues of fraud it was quite proper for the court to have empaneled the jury, to have submitted the issues to that jury, and to have been advised by the determinations which the jury made upon those issues, adopting or rejecting them, as they appealed to the conscience of the chancellor. And this in fact was precisely what the court here did, in adopting the findings of the jury, and in supplementing those findings with others which it made, addressed both to the legal and equitable considerations in the case.

Appellant next contends that certain findings must be disregarded because of their uncertainty, those findings in this respect being like the attempted findings condemned by this court in such cases as *Ladd* v. *Durkin*, 51 Cal. 277; *Harlan* v. *Ely*, 55 Cal. 340, and *Goodnow* v. *Griswold*, 68 Cal. 599, [9 Pac. 837]. And next the contention is made that the findings themselves are in very vital respects contradictory and self-destructive. To both of these contentions it may be answered, first, in general terms, that it is only when a judgment rests upon some particular finding for its validity and support that the lack of sufficient evidence to support such finding, or the contradictoriness between two findings, treating of the same essential matter, will necessitate a reversal of the case. Or, in other words, however unsupported, however lame, however inconclusive, any number of the findings may be, if in any case there be one clear, sustained and sufficient finding upon which the judgment may rest, every presumption being in favor of the judgment, it will be here concluded that the court did rest its judgment upon that finding, or those findings, and the others may and will be disregarded. (*Thayer* v. *Tyler*, 169 Cal. 671, [147 Pac. 979].) So here, we need not follow counsel through his argument as to the ambiguity and uncertainty which attaches to such a finding as "that the allegations of plaintiff's complaint, except as ad-

mitted by the answer or as found herein, are untrue," for the findings of the court upon the question of the fraud in the procurement of the contract of guaranty are clear, full, and explicit, and are in and of themselves entirely sufficient to support the judgment. Such being indisputably the case, it matters not whether in law or in fact, Kenneth Donnellan was or was not indebted to plaintiff. His indebtedness, under the finding that the guaranty was procured by fraud, was not protected nor secured by that guaranty, and the issue of his indebtedness is thus eliminated from this case and left for determination between the bank and Kenneth Donnellan himself. Appellant's argument on the question of indebtedness proceeds upon the proposition that the court has found, in effect, that Kenneth Donnellan was not indebted to the bank at all, and that, not being indebted to the bank, there was no liability under the contract of guaranty, conceding that contract of guaranty to be valid. Such, in truth, is one phase of the court's finding and judgment. But appellant argues that this is wholly inconsistent with the findings of the court that plaintiff's officers fraudulently concealed from defendants the fact that Kenneth Donnellan was heavily indebted to the bank, and that if Kenneth Donnellan was heavily indebted to the bank it could not be true as by the other findings declared, that he owed nothing to the bank, and, conversely, if he did owe nothing to the bank, the officers of the bank were guilty of no fraudulent misrepresentation or concealment even if they declared that he was not so indebted. But the answer to this is that these defendants were entitled to set forth by their answer as many defenses, even inconsistent defenses, as they had. (Code Civ. Proc., sec. 441.) They were thus entitled to show, if they could, that the contract of guaranty was procured by fraud and therefore void. They were entitled to show as a separate defense, if they could, that conceding the validity of the contract of guaranty, no liability had arisen under it by reason of the fact that no indebtedness had been incurred by Kenneth Donnellan covered by its terms. It may be added that, of course, it is quite apparent that the differences between the litigants here arise over the proposition as to whether or not the indebtedness to the bank was the individual indebtedness of Kenneth Donnellan, or was the indebtedness of the Kenneth Donnellan Company, the admitted fact being that the guaranty was to protect against

the debts of Kenneth Donnellan, and the evidence showing that all of these transactions by which the indebtedness arose were transactions by and in the name of the Kenneth Donnellan Company. Plaintiff on the trial (appellant here) vigorously contends that under the principle that equity will look through form to substance, it must be declared that the Donnellan Company, of which Kenneth Donnellan owned all the stock, was a mere instrumentality through which he conducted his business to avoid the claims of creditors. Respondents, however, insist that Kenneth Donnellan did not own all the stock of the corporation; that it was not, therefore, his mere instrumentality; that they did not even know that the Kenneth Donnellan Company was doing business; that they never undertook to guarantee the debts of the Kenneth Donnellan Company; that as guarantors favored by the law they are entitled to stand upon the strict letter of their contract, and that the principle of equity invoked, while applicable in cases where it is sought to charge the principal debtor hiding behind the veil of his own corporation, has no applicability whatsoever to a contract of guaranty such as this, which runs to the debts of an individual and to the transactions of that individual, and not to the debts of the corporation nor to transactions of that corporation. The fact that the court adopted defendants' view of this matter goes far to explain away the asserted contradictoriness of the findings. But this consideration need not further be pursued, since the contradictoriness which appellant asserts even if it exists has no materiality, we repeat, if the guaranty was secured by fraud. Or, if it has materiality at all, it is only in argument as to the weight of the evidence touching the concealment of plaintiff's officers as to the indebtedness of Kenneth Donnellan to the bank, in view of the finding of the court that there was no such indebtedness. And upon this proposition we need only say that plaintiff contends that at the time the guaranty was given, Kenneth Donnellan was personally indebted to the bank; that the contract of guaranty was fairly procured and that it covered and was meant to cover this precise indebtedness. The duty of the guarantee under the circumstances, does not depend upon the ultimate determination of the court as to whether or not a debt, or a debt in any given amount, existed. It depends upon his knowledge and belief and the obligation upon him to disclose, or the right resting with him

not to disclose, to the intending guarantor what that knowledge and belief is.

So, necessarily, we are brought to a consideration of the all-essential findings of the fraud practiced upon the defendants in the procurement of their contract. The findings in this regard have been quoted, since they set forth these matters with particularity. Are these findings sustained? Indubitably they are. Further, it is found, and the evidence sustains the findings, that in January, and shortly prior to the execution of the contract of guaranty, the plaintiff's president had discovered that the bank had sustained a serious loss, though the exact amount could not be determined; that this loss was not sustained through the legitimate brokerage business of Kenneth Donnellan or the Kenneth Donnellan Company, which it was represented to these defendants was the only business that Kenneth Donnellan had with the bank; that these losses were stock gambling losses; that the assistant cashier, Broberg, was a "partner," a coadjutor and co-operator with Kenneth Donnellan in these stock gambling transactions; that Broberg was to share in the profits and losses of these transactions and advanced the bank's money for these speculations; that the transactions were all *eo nomine* those of the Kenneth Donnellan Company, and on the books of that company were kept accounts in the name of Broberg, showing his interest in these transactions, though subsequently and at the request of Broberg, and when an investigation was imminent, his name was erased and a fictitious name entered in place thereof. As to the first guaranty of ten thousand dollars, which it will be remembered was surrendered and canceled when the later thirty thousand dollars guaranty was given about a month later, it is shown that Broberg, as an officer of the bank, went to J. W. Donnellan and solicited from him and his wife this guaranty on behalf of the bank. He knew at the time that Kenneth Donnellan or the Kenneth Donnellan Company was indebted to the bank in an amount exceeding the guaranty sought, and not only concealed this knowledge, but represented that Kenneth Donnellan was doing a safe and lucrative business. He described the business as a purely brokerage business; that stocks were bought by Kenneth Donnellan upon the order of customers; that Kenneth Donnellan not having the money to pay for the stocks, secured the money from the bank, the stocks being returned to the bank;

that a draft was drawn against the purchaser; the bank received the money when the purchaser paid for and took the stock, and if he failed so to do, the only possible loss to the bank was the depreciation in the value of the stock which might result between the time it was bought by Donnellan and the time when, after repudiation by the purchaser, it could be sold upon the market; that in the nature of things this prospective loss was negligible, but that there was a short interval of time during which the bank had put out this money and was without security to protect itself, and that the bank itself, or the bank commissioner, thought that some such security should be given, and the bank would accept this guaranty from the defendants, which they could give without risk. Such in brief was the evidence touching the giving of the first guaranty. The second guaranty was given under the active solicitation and procurement of the president of plaintiff, who had come to know the nature of these transactions and that the bank had sustained a heavy loss because of them. The president represented to J. W. Donnellan, the father of Kenneth, that he was very fond of his son and desired to continue business with him, describing the business which the son was doing as had Broberg. He explained that the possibility of loss was extremely remote; that the son's business was increasing and his transactions growing so large that a greater security than the ten thousand dollars guaranty was desirable. J. W. Donnellan did not know that his son had been speculating; did not know that any loss on account of speculation had been incurred, and as to pre-existing indebtedness knew only of the minor amount hereinbefore mentioned, which was subsequently discharged by payment. After giving the guaranty he sought information touching the condition of his son's account with the bank and could obtain none. Kenneth Donnellan testifies that after the president discovered the bank's loss he was sent for by the president and informed that the loss figured up in excess of thirty-one thousand dollars. He went repeatedly to the bank in the matter of his accounts and the president suggested that he endeavor to secure a guaranty from his father to cover this indebtedness. He told the president that it would be useless for him to try to secure such a guaranty. The president then told him to refrain from speaking to his father about it, but to

allow him (the president) to present the matter, because he thought he could do so in such a manner as not to alarm the father. The nature of Kenneth Donnellan's business having become known to the president of the bank, the bank's funds were no longer available to him, and after the date of the guaranty no money was ever advanced by the bank to him or the Kenneth Donnellan Company. Therefore the only indebtedness of Kenneth Donnellan or of the Kenneth Donnellan Company was that which had arisen, under the circumstances indicated, before the giving of the guaranty. Mrs. Donnellan executed the guaranty with her husband upon the representations made by him, which representations were as hereinbefore set forth. The president of the bank himself testified, that in requesting the thirty thousand dollars guaranty from Mr. Donnellan, he did not inform him of the speculative business done by his son or the Donnellan Company, nor that there was a loss or that there might be a loss; that "my purpose was to get from Colonel Donnellan and his wife the larger guaranty. If Colonel Donnellan had wanted to get any information from me he could have asked for it and I would have responded to any inquiry made or have given him any statement he asked for. I certainly was not going to frighten him by saying that there was a big loss in the bank here and I wanted him to give me a guaranty.

"Q. If you had told him that it probably would have frightened him and he probably would not have given the guaranty?

"A. He is human.

"Q. And being human, if he knew what you knew, he would not have given the guaranty?

"A. I didn't say that; his affection for his son—he was responsible largely for the business being in the bank, and he might say, it is on me for any losses."

Touching numerous statements testified positively to by Mr. Donnellan as having been made by the president during the course of their conversation—statements going to the safe nature of the brokerage business done by his son and the remote possibility of loss—when asked if he had made them the witness failed to remember. It has been necessary thus to state the evidence because of the underlying question of law which, as has been previously intimated, controls the creditor under such circumstances, and the applicability of which law

is, therefore, most important in determining whether or not fraud was perpetrated upon the defendants. Or, phrased differently, what was the legal duty of disclosure incumbent upon the president in soliciting this guaranty under the circumstances indicated? If he did in this matter all that the law requires, if he disclosed, so far as disclosure was incumbent upon him, if there was no *suppressio veri* of which the defendants could with justness complain, then no fraud was committed in the procurement of the contract, and to this final underlying consideration we are thus brought.

Two distinct elements enter into the fraud charged and found against the plaintiff: 1. That of positive misrepresentation; and 2. That of concealment of facts and circumstances affecting the situation of the parties important for the intending guarantors to know, known to the plaintiff's president soliciting the guaranty and concealed by him. The first of these are the representations testified to by the defendant J. W. Donnellan to the effect that the plaintiff's president informed him that his son was doing a large and prosperous brokerage business, and conveying by implication, and by silence upon other matters, that this was all of the business which he was doing. The concealments were of the admitted facts that plaintiff's president did not disclose to him that the loss had already been incurred; that it had been incurred through stock gambling, in which an officer of the bank was jointly interested with his son, and that the loss was so large that it probably exceeded the amount of the guaranty requested. Can it be debated whether or not these misrepresentations and this concealment, so found by the court, are sufficient to avoid the contract? The principles of equity and the adjudicated cases applying them return but one answer. The case, it is to be borne in mind, is not that where the surety or guarantor comes forward at the request of the debtor and simply offers to give the creditor a certain guaranty. In such cases the general holding is that no duty of disclosure is incumbent upon the creditor, since, he has asked nothing of the guarantor and without breach of any faith, he may assume that the debtor himself has informed the intending surety of all that the latter desires to know. His duty therefore is performed if he fully and fairly answers the questions put to him, and conceals nothing which he himself believes might influence the surety's conduct. Such was

the situation in the case relied on by appellant of *Hamilton* v. *Watson*, 12 Clark & Finnelly 107, [8 Eng. Reprint, 1339], where the House of Lords decided that "a surety is not of necessity entitled to receive, without inquiry from the party to whom he is about to bind himself, a full disclosure of all the circumstances of the dealings between the principal and that party. If he requires to know any particular matter, of which the party about to receive the security is informed, he must make it the subject of a distinct inquiry." (The quotation is from the syllabus.)    But the general principle of English jurisprudence, as well as of American, is that laid down by the same House of Lords, in *Railton* v. *Mathews*, 10 Clark & Finnelly 934, [8 Eng. Reprint, 993.]    The facts were that one had become a surety in a bond for the fidelity of a commission agent to his employers.    After some time the employers discovered irregularities in the agent's accounts and sued on the guaranty.    The surety instituted his suit to avoid the bond on the ground of concealment by the employers of material circumstances affecting the agent's credit prior to the date of the bond, these circumstances being that the agent's acccounts had been irregular and that he had taken money of his employers.    These circumstances, it was contended, if communicated to the surety, would have prevented him from undertaking his obligation.    The judge directed the jury that "the concealment, to be undue, must be willful and intentional, with a view to the advantages the employers were thereby to gain."    The House of Lords held this instruction to be erroneous in point of law, and declared: "Mere non-communication of circumstances affecting the situation of the parties, material for the surety to be acquainted with, and within the knowledge of the person obtaining a surety bond, is undue concealment, though not willful or intentional, or with a view to any advantage to himself." (The quotations are again from the syllabus.)    That this is the governing principle in the American as well as in the English courts, is abundantly established.    "The contract of surety imparts entire good faith and confidence between the parties in regard to the whole transaction.    Any concealment of material facts, or any express or implied misrepresentation of such facts, or any undue advantage taken of the surety by the creditor, either by surprise or by withholding proper in-

formation, will undoubtedly furnish a sufficient ground to invalidate the contract.'' (Story's Equity Jurisprudence, sec. 324.) ''If the creditor conceal any fact unknown to the proposed surety which, had he known it ,would have deterred him from becoming surety . . . it is a fraud upon him and relieves him from obligation. Especially is this so where the obligation is entered into at the request of the person to whom the security is given.'' (*Schoonover* v. *Osborne,* 108 Iowa 453, [79 N. W. 263].) And without further quotations reference may be made to De Colyar on Guaranties, 369, 370; Daniel on Negotiable Instruments, sec. 1309; Brand on Suretyship & Guaranty, sec. 126; *Jungk* v. *Holbrook,* 15 Utah, 198, [62 Am. St. Rep. 921, 49 Pac. 305] ; *Hall* v. *Clopton,* 56 Miss. 555; *Gist* v. *Feitz,* 43 Neb. 238, [61 N. W. 621] ; *Doughty,* v. *Savage,* 28 Conn. 146; *Wilmington etc. R. R. Co.* v. *Ling,* 18 S. C. 116; *Springfield* v. *Park,* 3 Ind. App. 173, [29 N. E. 444] ; *Dinsmore, Trustee,* v. *Tidball,* 34 Ohio St. 411; *First Nat. Bank etc.* v. *Terry,* 135 Fed. 621; *Farmers' Nat. Bank* v. *Van Slyke,* 1 N. Y. Supp. 508, 49 Hun, 7; *Franklin Bank* v. *Cooper,* 36 Me. 180; *Harrison* v. *Lumbermen etc. Ins. Co.,* 8 Mo. App. 37; *Benton Co. Sav. Bank* v. *Boddicker,* 105 Iowa, 548, [67 Am. St. Rep. 310, 45 L. R. A. 321, 75 N. W. 632] ; *State* v. *Sooy,* 39 N. J. L. 135.

To sum up, then, defendants were solicited to give the guaranty by plaintiff's president. The latter knew that the amount of the guaranty was equaled by a pre-existing debt due to the bank from the stock gambling transactions of Kenneth Donnellan and the bank's assistant cashier. He knew that J. W. Donnellan and his wife did not know this and it was a material circumstance affecting the contract. The contract, in contemplation of the defendants, was one under which they would incur little or no risk out of the transactions of a legitimate brokerage business conducted by their son with plaintiff. The contract into which they were induced to enter was one whereby they agreed to pay thirty thousand dollars already lost to the bank by the gambling operations of their son. Plaintiff's president did not inform them of this, for the avowed reason that he did not propose to tell J. W. Donnellan anything which might cause him not to sign the guaranty. The duty of disclosure rested with plaintiff's

president and he did not make it. The finding is therefore supported, and the judgment appealed from is affirmed.

Melvin, J., and Lorigan, J., concurred.

Hearing in Bank denied.