[Civ. No. 28701. Second Dist., Div. One. Dec. 28, 1964.]

PRODUCE CLEARINGS, Plaintiff and Appellant, v. PAULINE BUTLER, as Administratrix, etc., Defendant and Respondent.

William J. Cusack for Plaintiff and Appellant.

Harvey B. Himmel for Defendant and Respondent.

WOOD, P. J.—This is an action upon a creditor's claim against the administratrix of the estate of Max Butler, deceased. The claim is based upon a written guaranty by Max Butler of the faithful performance by Jackney Sportswear Company of a factoring agreement between the Jackney company and the plaintiff. In a nonjury trial the court determined that plaintiff, at the time it requested execution of the guaranty by Max Butler, failed to inform him of Jackney's previous conduct in selling fictitious accounts to plaintiff under the agreement. Judgment was for defendant. Plaintiff appeals from the judgment.

Appellant contends that the evidence does not support the judgment.

On April 3, 1957, plaintiff, acting through its vice-president Myron Levi, entered into a factoring agreement with Jackney Sportswear Company, a partnership consisting of Sidney Douglas and Jack Butler (the son of Max Butler), whereby Jackney agreed to sell its accounts receivable to plaintiff.[1]

The agreement provides in part that Jackney "represents" (a) that each and all of the accounts which Jackney shall sell to plaintiff shall represent a debt owing to Jackney in the net amount of the invoice for services rendered or merchandise sold and delivered by Jackney in the ordinary course of its business; and (b) that none of said accounts is or will be disputed or contested by the debtor and that the whole thereof is owing to Jackney without rights of offset.

Concurrently with the execution of the agreement (on April 3, 1957), Sidney Douglas and Jack Butler executed a guaranty appearing at the bottom of the last page of the agreement. The guaranty provides as follows:

"GUARANTY:

"FOR VALUE RECEIVED, the undersigned, jointly and severally, guarantee to the buyer [plaintiff] the full and faithful performance of all of the obligations of the seller [Jackney] under the provisions of the foregoing contract, and guarantee the payment to the buyer of all sums which the seller may become obligated to pay to the buyer to the same extent as the seller is now or may hereafter become obligated to the buyer under the provisions of this contract, or in any other manner. The buyer shall not be required to proceed against the seller or his customers before enforcing this guaranty."[2]

Jackney sold its accounts receivable to plaintiff under this agreement from April 3, 1957, to March 22, 1960. During this period plaintiff also made loans to Jackney from time to time.

Levi was the "primary officer supervising the Jackney

---

[1]In the course of negotiations preceding execution of the agreement, Levi received a financial statement showing Jackney's condition as of December 31, 1956, accompanied by an explanatory letter from Jackney's accountant to the effect that Max Butler was not a partner in Jackney Sportswear Company, but that he was a creditor of Jackney, having loaned Jackney $64,737.90 as of that time.

[2]At the time of execution of the guaranty and factoring agreement, Sidney Douglas executed a second trust deed on his home in favor of plaintiff, and Jack Butler executed a trust deed on his home in favor of plaintiff, apparently as further security for faithful performance of the factoring agreement. Subsequently, and prior to April 1959, Jackney acquired the property where its business was being conducted and, at Levi's request, a second trust deed on this property was also executed in favor of plaintiff.

account'' on behalf of plaintiff throughout the period of plaintiff's dealings with Jackney. In the latter part of April 1959, Levi discovered that Jackney had sold fictitious accounts[3] to plaintiff during the months of February, March, and April of 1959 in the total amount of $21,555.50.

Upon making this discovery Levi recouped plaintiff's losses by charging the losses against a reserve fund held by plaintiff under the provisions of the factoring agreement. At this time (about May 1, 1959) Levi told Sidney Douglas and Jack Butler that he insisted upon obtaining a chattel mortgage on Jackney's machinery and equipment, and upon obtaining a personal guaranty by Max Butler (of Jackney's performance under the agreement), ''if we [plaintiff] were to continue'' doing business with Jackney under the factoring agreement.

A few days later (May 6, 1959) Levi went into Jackney's office, and at that time he had with him an unexecuted chattel mortgage and the guaranty which had been executed previously by Sidney Douglas and Jack Butler (but not executed by Max Butler). When Levi entered the office, Sidney Douglas and Jack Butler were the only other persons present. Levi testified that he handed the mortgage to Douglas and Jack Butler; and that Douglas and Jack Butler signed it. Levi then said, ''As we spoke of, if we are to continue our financing, I must have Mr. Max Butler's personal guaranty.'' Jack Butler thereupon left the office and went into Jackney's garment factory, apparently in the rear of the building where Max Butler was working as an employee. A few minutes later Jack Butler and Max Butler came into the office. Then, according to Levi's testimony, while Levi and the two Butlers were in the office, there were statements and acts as follows: Levi handed the guaranty to Jack Butler. Max Butler went to the side of the room and sat down, and Jack handed the guaranty to Max. Max said, ''What is this?'', and Jack Butler said, ''If Produce Clearings is to continue to finance, they insist on your personal guaranty.'' Max then said, ''Should I sign it?'', and Jack replied, ''Yes.'' Max then signed the guaranty (at a place on the form below the signatures of Douglas and Jack Butler) in the presence of Levi and Jack Butler. Levi did not at

---

[3]These fictitious accounts consisted of nine invoices which did not in fact represent debts owing to Jackney. The invoices were apparently directed to two customers of Jackney (Peppermint Stick and Childrens Shop).

that time or prior thereto inform Max Butler that Jackney had sold fictitious accounts. No representative of plaintiff told Max Butler that Jackney had sold fictitious accounts. There was no evidence that Max Butler knew of such conduct on the part of Jackney. Jack Butler died prior to the trial.

After obtaining the chattel mortgage and Max Butler's guaranty, plaintiff continued to purchase Jackney's accounts receivable under the factoring agreement. In late September 1959 Levi discovered that Jackney had sold fictitious accounts to plaintiff during the months of June, July, August, and September of 1959. Levi talked to Douglas about these accounts, and Douglas admitted that the accounts were fictitious. Douglas then went over Jackney's records for the purpose of compiling a list of the fictitious accounts.

After four or five days (about October 2, 1959), a list of fictitious accounts was completed. This list included about two hundred invoices sold to plaintiff by Jackney during said months, but the invoices did not in fact represent debts owing to Jackney. The total amount of those fictitious accounts was $121,783.41.

While the list was being prepared, plaintiff continued to purchase Jackney's accounts. Following completion of the list (about October 2, 1959), plaintiff and Jackney continued to operate under the factoring agreement until March 22, 1960, and plaintiff advanced loans to Jackney during this period to finance Jackney's operations. The loans were made against Jackney's reserve fund held by plaintiff under the agreement. (Apparently there was a reserve fund of $39,-371.22 as of September 1959.) Max Butler was not informed of the fictitious accounts or the loans.

Max Butler died in April 1960, and thereafter plaintiff filed a creditor's claim against his estate, which claim was based upon the guaranty. After the claim was rejected, this action for $61,619.23,[4] based upon the claim, was commenced.

The court found that on May 1, 1959, plaintiff informed Sidney Douglas and Jack Butler that plaintiff would not

[4]Levi testified that the balance due was $52,238.18, plus interest at the rate of 10 per cent per annum from December 16, 1960, and that this balance included loans by plaintiff and losses by plaintiff on the fictitious accounts. This balance apparently was computed by allowing credits for some of the funds realized by plaintiff in foreclosure proceedings on the chattel mortgage ($15,000), on the Jackney trust deed ($8,000), on the Douglas trust deed ($9,000), on Jack Butler's trust deed ($4,000), and credit for an income tax write off of $40,000 for bad debts.

continue to purchase Jackney's accounts unless Jackney's obligations and performance were further secured by the personal guaranty of Max Butler; that on May 6, 1959, in Jackney's office, and in the presence of Levi and Jack Butler, Max Butler was handed a guaranty form to sign guaranteeing the obligations and performance of Jackney in favor of plaintiff; that Max Butler signed this guaranty on May 6, 1959, at Jackney's offices, as set forth in the findings; and that neither on May 6, 1959, nor at any other time before said date, did plaintiff or any of plaintiff's officers or agents inform Max Butler that his guaranty was requested and required by plaintiff ''because of a previous course of conduct by Jackney in selling fictitious accounts receivable to plaintiff.'' It thus appears the court in effect found that plaintiff requested Max Butler's guaranty, and that plaintiff failed to inform Max Butler, before or at the time when he executed his guaranty, that Jackney had previously sold fictitious accounts to plaintiff.

The court made a conclusion of law that plaintiff was under an obligation to inform Max Butler, before he executed his guaranty, that Jackney had previously sold fictitious accounts to plaintiff, and that by reason of such failure to inform Max Butler, the plaintiff could not recover in this action.

Appellant contends that the evidence does not support the judgment. Appellant argues that the evidence does not show any ''communication'' between plaintiff and Max Butler relating to a request for his guaranty—that the evidence shows that the negotiations with Max Butler were conducted by Jackney (the debtor), not by plaintiff (the creditor); and that the plaintiff, therefore, was not under an obligation to inform Max Butler of Jackney's previous sale of fictitious accounts to plaintiff.

There was evidence that Levi, who was plaintiff's vice-president, told Douglas and Jack Butler (on May 1, 1959) that plaintiff insisted upon obtaining Max Butler's personal guaranty of Jackney's performance as a condition of continuing business under the factoring agreement.

There was also evidence that Levi brought the guaranty form to Jackney's office on May 6, 1959, and stated to Sidney Douglas and Jack Butler that plaintiff must have Max Butler's personal guaranty in order for plaintiff to continue the financing. Max Butler was then brought into the office and the guaranty form was handed by Levi to Jack Butler, who handed it to Max Butler. When Max Butler asked what it

was, Jack Butler said, in Levi's presence, "If Produce Clearings is to continue to finance they insist on your personal guaranty." Max Butler then asked if he should sign, and Jack Butler replied, "Yes." Then Max Butler signed the guaranty form in the presence of Levi and Jack Butler.

It was not necessary that there be a direct statement or communication between Levi and Max Butler. As shown above, Levi stated plaintiff's demand for the guaranty to Sidney Douglas and Jack Butler, and the acts and statements whereby this demand was communicated to Max Butler occurred in Jackney's office in Levi's presence and at Levi's suggestion. The evidence was sufficient to support the finding to the effect that plaintiff requested Max Butler's guaranty.

There was also evidence that Levi knew of the fictitious accounts prior to May 1, 1959; Levi was in charge of plaintiff's dealings with Jackney under the factoring agreement; Levi did not inform Max Butler of the fictitious accounts before or at the time his guaranty was executed; and Max Butler did not know of the fictitious accounts. The evidence was sufficient to support the finding to the effect that plaintiff failed to inform Max Butler, before he executed the guaranty, that Jackney previously had sold fictitious accounts to plaintiff.

It thus appears that plaintiff requested Max Butler to execute the guaranty, without disclosing to him information as to fraudulent conduct of Jackney which bore directly upon the risk assumed by Max Butler as guarantor. Under such circumstances, plaintiff was under an obligation to inform Max Butler as to Jackney's conduct, and plaintiff's failure to do so invalidated the guaranty. (See *American National Bank* v. *Donnellan,* 170 Cal. 9, 21-23 [148 P. 188 Ann. Cas. 1917C 744] ; 46 Cal.Jur.2d, Suretyship and Guaranty, p. 200, § 11.)

"A suretyship contract imports entire good faith and confidence between the parties with regard to the whole transaction, and any concealment or misrepresentation of the facts or undue advantage taken of the surety by the creditor furnishes sufficient ground to invalidate the contract." (46 Cal.Jur.2d., *supra,* p. 200, § 11; see *American National Bank* v. *Donnellan, supra,* pp. 22-23.)

Appellant argues that *Mahoney* v. *Founders' Ins. Co.,* 190 Cal.App.2d 430 [12 Cal.Rptr. 114] is controlling here. That case is distinguishable from the present case in that the court therein found that the guaranty was requested by the

debtor, whereas in the present case the court found (as in the *American National Bank* case, *supra*) that the guaranty was requested by the creditor.

The evidence is sufficient to support the findings. The findings support the judgment.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied January 21, 1965, and appellant's petition for a hearing by the Supreme Court was denied February 24, 1965.