[Civ. No. 23212.   Second Dist., Div. Two.   Sept. 28, 1959.]

Estate of JAMES H. GOODHEW, JR., Deceased. WILLIAM I. GOODHEW, Petitioner; JAMES HENRY GOODHEW III et al., Respondents, v. GENEVA S. GOODHEW, Appellant.

Buchalter, Nemer & Fields, Murray M. Fields and Gerald D. Kleinman for Appellant.

Henry O. Wackerbarth, Nicholas, Kolliner & Van Tassel and Max G. Kolliner for Respondents.

FOX, P. J.—This is an appeal by Geneva S. Goodhew, widow of James H. Goodhew, Jr., from a judgment in a proceeding to determine heirship (Prob. Code, § 1080) in which the court found certain property held by the decedent at the time of his death was his separate property.

The appellant and the decedent were married on August 2, 1952. In September of 1946, decedent and his brother each purchased an undivided one-half interest in a piece of income property on Pico Boulevard for a total purchase price of $25,000. This was paid for in cash except for an $8,600 first deed of trust. The indebtedness was reduced at the rate

of about $85 a month and, at the time of the decedent's death, $880.04 remained unpaid. This balance was paid off by decedent's estate and his brother, 50 per cent each. Thereafter, the property was sold for $21,000. During the existence of their marriage, decedent paid a total of $1,572 toward reduction of the above encumbrance.

In May of 1946, decedent purchased an insurance policy on his life in the face amount of $10,000. During the marriage, decedent paid $30.84 a month as premiums on the above policy.

At the time of his death, James H. Goodhew, Jr., was president of the Goodhew Ambulance Service, Inc., and was receiving a salary of $1,220 per month. Decedent and his brother owned all of the stock of the corporation. On July 14, 1950, the decedent, his brother, and the Goodhew Ambulance Service, entered into a written agreement, paragraph 9 of which provides as follows:

"9. Upon the death of either James Henry Goodhew, Jr., or William I. Goodhew, the Corporation agrees to pay to his estate the annual salary paid to such decedent at the time of his death, said payments to be made monthly and to continue for a period of three years from the date of death, in consideration of the services which said decedent has heretofore rendered to the Corporation, and in consideration of the services to be rendered to the Corporation by each of them."

The decedent and his brother also owned income property on Hoover Street which was acquired prior to the subject marriage.

After the appellant and the decedent were married, he deposited his salary from the Goodhew Ambulance Service, as well as the rentals from the real property, into a joint checking account in the names of appellant and himself. Either could draw checks on this account. All expenditures paid by check after marriage were from this account; these included, *inter alia,* community living expenses, payments on the deed of trust on the Pico property, life insurance premiums, child support payments for a minor child of a previous marriage, and payments to an ex-wife pursuant to a property settlement agreement.

On August 20, 1955, James H. Goodhew, Jr., died testate, leaving as his sole heirs and beneficiaries under his last will and testament the appellant, his widow, and his children by previous marriages, James H. Goodhew III, Marcia Goodhew Wilson and D. Nicholas Goodhew, a minor child.

Pursuant to section 1080, Probate Code, the executor of the decedent's estate filed a petition for a decree determining interests therein. The appellant filed a claim of interest in the estate and claimed, *inter alia,* that (1) the money due under the agreement of July 14, 1950, is community property and she is entitled to one-half thereof; (2) community property contributed to the payment of premiums on the $10,000 insurance policy and therefore she is entitled to a portion of the proceeds of such insurance, and (3) community property was used to reduce the indebtedness on the Pico property and therefore she is entitled to an interest in the proceeds from the sale of the property.

The trial court found that all payments on the Pico encumbrance and for premiums on the $10,000 insurance policy were made from decedent's separate property. With respect to rights under the July 14th agreement, the court found that the agreement "was executed prior to his [decedent's] marriage to [the appellant] . . . and was executed among other things in consideration of certain agreements therein contained between the parties thereto respecting the sale or disposition of the stock of Goodhew Ambulance Service, Inc., owned by them and past services rendered to Goodhew Ambulance Service, Inc., by said decedent prior to his marriage to [appellant] . . . and all right, title and interest thereto, all benefits to be derived therefrom and all payments to be made by said Goodhew Ambulance Service, Inc., to said decedent's Estate pursuant to the terms and provisions thereof were at all times material hereto and now are the separate property of said decedent and said decedent's Estate."

As grounds for reversal, appellant argues in effect that the above findings are not supported by the evidence and that the court erred in receiving parol evidence with respect to the meaning of the July 14 agreement.

The appellant specifically attacks those findings which state that payments made on the Pico property and premiums paid on the $10,000 insurance policy after marriage were from the decedent's separate property. ■ It is well settled that "[w]hen a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. (Citation.)" (*Grainger* v. *Antoyan,* 48 Cal.2d 805,

80

807 [313 P.2d 848]; *Hunter* v. *Croysdill,* 169 Cal.App.2d 307, 313 [337 P.2d 174].)

■ In the instant case, from August 2, 1952, through August 20, 1955, the period of coverture, decedent's share of the income from the Pico and Hoover Street properties was in the gross amount of $9,868.13. This money was clearly his separate property (Civ. Code, § 163) and was not converted into community property upon being deposited in the same bank account with community funds for the obvious reason that the amount of separate funds so deposited can be ascertained and therefore can be traced. (*Thomasset* v. *Thomasset,* 122 Cal.App.2d 116, 124 [264 P.2d 626].) During this same period, decedent paid some $1,141 in premiums on the insurance policy in question, and his share of the payments on the trust deed amounted to approximately $1,572. It is clear, therefore, that decedent had available more than sufficient separate income with which to make the above payments and it would not have been necessary for him to resort to community property. The trial court found that these payments were in fact made from his separate income.

■ It was, of course, for the trial court to draw reasonable inferences from the testimony. Such as, for example, that it would be natural for the decedent to use a portion of the income received from the Pico property to reduce the indebtedness on that very property. Thus the Pico property would be taking care of itself, in accordance with a plan that is frequently followed. It must also be remembered that the insurance policy in question was decedent's separate property at the time of his marriage to appellant; was payable to his estate; and that thereafter he did not change the beneficiary. Thus the court could infer that he intended to retain the same as separate property in his estate. To accomplish this the court could properly conclude that he intended to and did make the premium payments out of separate property.

Based on the evidence referred to, and the inferences reasonably to be drawn therefrom, it cannot be said as a matter of law that the challenged findings do not have adequate evidentiary support.

Appellant argues, however, that a further finding made by the trial court that all community property income was expended during the marriage in payment of living expenses is not supported by the evidence. ■ The findings previously discussed amply support the judgment with respect to the

Pico property and the $10,000 insurance policy. As noted above, these findings are supported by substantial evidence. This being the case, other findings may be disregarded. (*American National Bank* v. *Donnellan*, 170 Cal. 9, 15 [148 P. 188, Ann.Cas. 1917C 744]; *Harkins* v. *Fielder*, 150 Cal. App.2d 528, 533 [310 P.2d 423]; *Logan* v. *Forster*, 114 Cal.App.2d 587, 602 [250 P.2d 730].) ■ As stated in *Logan* v. *Forster*, *supra*: "If one finding, sustained by sufficient evidence, will support the trial court's judgment . . . an appellate court will presume that the judgment was predicated on such finding, and questions relative to other findings become immaterial upon appeal and may be disregarded."

The July 14th agreement provided for the sale of the decedent's stock in the Goodhew Ambulance Service, Inc., to the corporation for a stated price of $50,000. The agreement further provided in paragraph 9, set out above, that the decedent's estate was to be paid the annual salary decedent was receiving at the time of his death for a period of three years "in consideration of the services which said decedent has heretofore rendered to the corporation, and in consideration of the services to be rendered to the corporation . . ."

Since the decedent owned the stock long before his marriage to the appellant, if the 36 payments constitute additional consideration for this stock, they are clearly separate property and appellant has no claim to this money. However, if said payments are in whole or in part consideration for personal services rendered by the decedent to the corporation after his marriage to the appellant, she would be entitled to a portion thereof.

The trial court found that the payments made pursuant to paragraph 9 were, among other things, in consideration of certain agreements of the parties respecting the sale or disposition of the stock. Hence the payments were separate property, and appellant had no valid claim thereto.

The trial court received extrinsic evidence as to the facts and circumstances surrounding the making of the July 14th agreement so as to assist it in determining the status of the payments (whether community or separate property) made to the estate thereunder.

Appellant first argues that the trial court erred in receiving extrinsic evidence with respect to the making of said agreement. This point, however, is not well taken. ■ The parol evidence rule does not prohibit the introduction of

intrinsic evidence for the purpose of showing that the true consideration for a written agreement is other and different from that recited in the agreement itself. (*Simmons* v. *California Institute of Technology*, 34 Cal.2d 264, 272 [209 P.2d 581]; *Blonder* v. *Gentile*, 149 Cal.App.2d 869, 874 [309 P.2d 147]; see Code Civ. Proc., § 1962, subd. 2.) ▪ Since the statement of consideration in the instant contract was not of a contractual nature and amounted to no more than a recitation thereof, and evidence relating to the true consideration would not alter any substantive obligation, right, or duty, such evidence was admissible.

▪ The question now posed is: Does the evidence and the inferences that reasonably may be drawn from that evidence sufficiently support the challenged finding? In our opinion this question must be answered in the affirmative. At the outset it must be borne in mind that decedent owned the stock prior to his marriage to appellant. It was therefore his separate property. Appellant does not dispute this. She makes no claim to the stock. Also, the contract out of which this phase of the case arises was executed some two years prior to the marriage. Whatever benefits decedent acquired under the contract were his separate property or that of his estate. One of these was the right of his estate to receive $50,000 for his stock upon his death. This sum would, of course, be separate property—a proposition that appellant does not question. But what is the character of the monthly payments to be made by the corporation to the decedent's estate during the three years following his death? As an aid to finding the answer to this question the trial court received evidence of the financial posture of the Ambulance Corporation and the relation of decedent and his brother to it. When the ambulance service was incorporated on December 10, 1945, its net worth was $77,500. The record does not disclose its net worth on July 14, 1950, when the agreement in question was made, but it does show its net worth to be $104,000 on August 31, 1952 (less than a month after decedent's marriage). This was two years one and a half months after the execution of the contract, at which time decedent and his brother owned all the stock of the corporation. In light of the growth pattern of the company between its incorporation in December, 1945, and August 1952, it is a reasonable inference that the $50,000 to be paid for the stock of either of the brothers upon his death represented the approximate true value of the stock on July 14, 1950. That would place the net worth of the corporation

at $100,000 on the latter date. It is apparent that the corporation was gradually improving its financial position and its net worth. But the sale of half of the stock for $50,000 (its approximate book value in July 1950) at some future date failed to take into account the probable growth of the business based on its previous development. As experienced business men in this field, it is a reasonable inference that they recognized this growth factor as an item of substantial but indeterminate value, the latter because of several imponderables. Hence they undertook to find a mutually satisfactory formula for fixing the value of the potential increment of the business. We need not speculate on how or why they arrived at the particular formula. Suffice it to say that the additional amount to be paid for the stock and the manner of payment were readily ascertainable from the agreement upon the death of either of the brothers. The formula applied alike to each of them. It is thus apparent that there was a reasonable basis for the trial court to infer that the money to be paid decedent's estate over the three-year period following his death was part of the consideration for the decedent's stock under the July 14th agreement. Decedent did not acquire any right under this agreement after his marriage that he did not have before. Since the stock was decedent's separate property, so was the full sale price thereof.

There is no evidence that the decedent rendered any services to the corporation after his marriage for which he was not fully compensated. In fact, the undisputed evidence is that the salary paid him was substantially in excess of that which the corporation would have been required to pay an outsider for like services. The explanation of such excess salary payments is that no dividends were paid and that this was simply a means of distributing such portion of the earnings as would otherwise have been paid in dividends. This fact, if it be such, does not assist appellant's case. It simply reveals that a portion of the money paid decedent as salary and treated as community income was actually income from his stock and could, no doubt, have been claimed by him as his separate property.

The judgment is affirmed.

Ashburn, J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 25, 1959. Peters, J., was of the opinion that the petition should be granted.