[Civ. No. 116. Fifth Dist. Feb. 13, 1963.]

SANDELL, INC., Plaintiff and Respondent, v. JOHN B. BAILEY, Defendant and Appellant.

Burke & LaRue and Annette LaRue for Defendant and Appellant.

Rowell, Lamberson & Thomas and Breckinridge Thomas for Plaintiff and Respondent.

BROWN, J.—Appellant appeals from a judgment in favor of respondent for $50,000 due on a note, plus interest and attorneys' fees.

Appellant was a director of Cleary Oil Company Limited, a Canadian corporation, from its inception until October 1955,

and Victor I. Sandell was appointed a director of this corporation in February 1955, later becoming its president in 1956.

The corporation, Cleary Oil Company Limited, issued an offering circular dated November 18, 1954, offering for sale 28,570 shares of the corporation at $10.50 per share upon the face of which is printed, ''These securities are offered pursuant to an exemption from registration with the United States Securities and Exchange Commission.'' Such circular stated that after the payment of 10 per cent commission, $238,500 of the proceeds would be applied against the indebtedness of the company and its subsidiary, and only $21,000 would be added to working capital. At the time of the circular appellant owned 13,174 shares personally and as a partner in Bailey and Company, and Mr. Sandell owned 3,810 shares. Appellant was one of the signers of the circular, and the underwriter in charge of the sales, but was not a subscriber.

A permit was issued by the Division of Corporations of the State of California on October 22, 1954, which, upon its face stated, ''This issue is considered highly speculative'' and further, that the permit ''does not constitute a recommendation or endorsement,'' being permissive only.

A permit was also issued by the Division of Corporations on March 16, 1955, in which the corporation was authorized to sell to its then stockholders 48,570 of its shares at $10.50 per share, to be deposited with an escrow holder.

All of the shareholders in this corporation exercised their preemptive rights to purchase from the corporation under the offering circular one share for each share owned, and appellant not having sufficient cash available to do so and being anxious to exercise his preemptive rights, obtained a loan from the respondent for $50,000 and executed a note dated April 1, 1955, for that amount, payable 8 months and 19 days thereafter or as otherwise agreed, plus interest at 5 per cent per annum, and attorneys' fees. At the same time the appellant and the respondent and Mr. Sandell agreed orally, which agreement was reduced to writing on April 15, 1955, that the terms governing the loan of $50,000 as well as security for the loan whereby the appellant deposited with Mr. Sandell, as trustee, 5,000 shares of Cleary Oil Company Limited capital stock, would include the following:

''Said note shall be due and payable on January 15, 1956, or as soon thereafter as clearance is granted by the S.E.C. for the sale by Party of the Second Part, of Cleary Oil Com-

pany Limited, Capital Stock shares, purchased under the offering circular, dated November 18, 1954.''

It further provided: ''As consideration for this loan, John B. Bailey does hereby grant to Victor I. Sandell, an option to purchase 1500 shares Cleary Oil Company Limited, Capital Stock at $10.50 per share, U. S. Funds. This option will become effective on November 19, 1955, or as soon thereafter as clearance is granted from the S.E.C. for John B. Bailey to transfer those shares from stock purchased under an offering circular, dated November 18, 1954.

''In no event shall Victor I. Sandell, as Trustee, be required to return to John B. Bailey the 1500 shares held by him for the exercise of his option, until the option is exercised.''

On July 5, 1957, respondent filed suit against appellant alleging the note, that it was due and unpaid, that the agreement along with the note provided for payment to be due January 15, 1956, or as soon thereafter as clearance was granted by the Securities and Exchange Commission for the sale by defendant (appellant herein) of the Cleary Oil Company Limited capital stock which he purchased under the offering circular; that there are no laws of the United States nor any rules by the commission which provide for the granting of such a clearance; that the S.E.C. does not have power to grant such a clearance; that the note became due January 15, 1956, whch is a reasonable time following execution of the note; and that the defendant had contended that said note was not due until such clearance was secured.

Appellant answered, alleging that there was a provision for such a clearance; denied that said note became due on January 15, 1956, or any other date and alleged that said note was not due and would not be due until a clearance had been obtained; denied the lack of provision or procedure for granting of a clearance by the commission; denied that the laws of the United States did not require such a clearance for the sale by defendant of the shares in question, to wit, those purchased under the offering circular dated November 18, 1954; denied that the S.E.C. lacked authority, had not power, could not then grant and that it was not possible for such a clearance to be granted by the S.E.C.; alleged that the S.E.C. did have power and authority at all times to grant a clearance; and as a special affirmative defense alleged that the condition in the contract which states that the note shall be due and payable ''on January 15, 1956, *or as soon thereafter as clearance is granted by the S.E.C. for the sale by Party*

*of the Second Part* [appellant herein], of Cleary Oil Company Limited, Capital Stock shares, purchased under the Offering Circular, dated November 18, 1954,'' (italics added) expressly provides that no liability of the appellant shall arise and he shall have no duty to pay until the said condition occurs. Appellant further alleged that the fair market value of the 1500-share option was $50,000, and that the note has fully been paid because the consideration for the loan was usurious and that respondent and its president, Mr. Sandell, were alter egos.

The pretrial order recites, in part:

''Contentions of the Parties:

''Plaintiff alleges that the 'clearance,' referred to in the pledge agreement dated April 15, 1955, is impossible of performance and, therefore, void, and that the note by its terms has become due and payable with interest and reasonable attorneys' fees, and that although demand has been made for payment, defendant refuses to pay.

''The defendant contends the 'clearance' is not an impossible event and the condition being breached, the note did not mature and defendant is not therefore in default. As a separate affirmative defense, the defendant asserts the following portion of the agreement dated April 15, 1955, which provides as follows:

'' 'As consideration for this loan, John B. Bailey does hereby grant to Victor I. Sandell, an option to purchase 1500 shares Cleary Oil Company Limited, Capital Stock at $10.50 per share, U. S. Funds.',

''violates the usury laws of the State of California in that the consideration for the loan is in excess of the rate of interest allowed thereby. In this connection, the Answer alleges that the option had a value of $50,000.00 at the time it was granted and that *this option was exercised on or about December 8, 1955,* and this value should be applied in the payment of the principal of the note. The defendant also denies that $7500.00, or any other amount, is a reasonable sum to be allowed plaintiff as attorneys' fees.'' (Italics added.)

Issues remaining for trial were:

1. The amount of money, if any, due plaintiff as principal, interest, and attorneys' fees under his complaint;

2. Whether the ''clearance,'' above referred to, is impossible of performance;

3. Whether or not said note is usurious and the relief, if

any, the defendant may be entitled to under his counterclaim, all as framed by the pleadings.

Number 2 in the issues remaining for trial was added to the pretrial order by the judge at the special instance and request of the appellant. By logic, the words "issues remaining for trial" include the issues brought out in the pretrial order of "Contentions of the Parties."

After a trial of the action the court found for the respondent, granting judgment for $50,000 plus interest, and attorneys' fees in the sum of $5,000, and the relevant findings are summarized as follows:

The court found that the appellant executed and delivered the note (finding No. 2); that the agreement provided that the note was due and payable on January 15, 1956, or as soon thereafter as clearance was granted by the S.E.C. (No. 3); that it was not true that said "clearance" was intended to be a condition precedent to the payment of the note but that there was an absolute promise to pay (No. 4); that the parties intended that the granting of the clearance was to enable the appellant to have a reasonable time to assure himself that he could safely sell said stock purchased by him under the November 18, 1954, offering circular without being in violation of the regulations of the S.E.C. (No. 5); and that a reasonable time for securing such clearance was 90 days after January 15, 1956 (No. 6).

The court also found that the shares of stock had no real value in excess of $10.50 per share and that the option to purchase said shares had no value which would constitute an interest rate on said loan of more than 10 per cent per annum; that V. I. Sandell or respondent had no intent to exact any sum which would constitute a usurious loan and that the appellant had no intent to offer anything of value in return for said loan which would also constitute a usurious loan; and that the respondent or V. I. Sandell did not intend to violate the usury laws and there was no corrupt or usurious agreement.

This court is bound by the familiar rules as to supporting the findings of the trial court, that it is the burden of appellant to show such a lack of substantial facts in the record that there is no ground upon which the trial court could have based any reasonable inference in support of its finding (*Kirchnavy* v. *Levet*, 127 Cal.App.2d 586, 588 [274 P.2d 161]; *Endo* v. *State Board of Equalization*, 143 Cal.App.2d 395, 399 [300 P.2d 366]; *Estate of Arstein*, 56 Cal.2d 239, 240 [14 Cal.

Rptr. 809, 364 P.2d 33]; *Estate of Goodhew,* 174 Cal.App.2d 75, 79 [344 P.2d 63]); that if there is a conflict in the evidence the findings of the trial court will not be disturbed (*Martinez* v. *Hudson,* 14 Cal.App.2d 42, 44 [57 P.2d 970]); that when a finding of fact is attacked on the ground of insufficiency of the evidence, the sole function of the appellate court is to determine whether there is any substantial evidence, contradicted or uncontradicted, which will support the challenged finding (*Key* v. *McCabe,* 54 Cal.2d 736, 738 [8 Cal.Rptr. 425, 356 P.2d 169]; *Primm* v. *Primm,* 46 Cal.2d 690, 693 [299 P.2d 231]); and any ambiguities in the findings of fact and conclusions of law are to be resolved in favor of sustaining the judgment (*Murphy* v. *Sheftel,* 119 Cal.App. 467, 469 [6 P.2d 549]).

In *Browar* v. *Paul Hardeman, Inc.,* 183 Cal.App.2d 708, 712-713 [7 Cal.Rptr. 231], the court said: "Findings must be sufficiently definite and intelligible to dispose of the material issues. They are to be liberally construed on appeal to support the judgment. [Citation.] Where a court renders a judgment without making findings on all material issues of fact the decision is against law and constitutes ground for reversal on appeal, provided it appears that there was evidence on that issue sufficient to sustain a finding in favor of the party complaining. [Citation.]

"After reading the transcript of the testimony and examining the exhibits, it is apparent that any change in the findings based on the evidence would not improve either plaintiff's position and adequate credible evidence supports findings and judgments denying any award to either plaintiff."

The court, in *Virtue* v. *Flynt,* 164 Cal.App.2d 480 [330 P.2d 879], said at page 484: "It is well settled that if findings are made upon issues which determine the cause, other issues become immaterial and failure to find thereon does not constitute prejudicial error."

Appellant claims that the court erred in finding that the note was due, and quotes rule 216 of California Rules of Court,* as follows:

"When filed, the pretrial conference order becomes a part of the record in the case and, where inconsistent with the pleadings, controls the subsequent course of the case unless modified at or before trial to prevent manifest injustice"; and claims that findings numbers 4 and 5 on the intention of the

---

*Formerly Rules of the Superior Court, rule 8.8.

parties in referring to "clearance" in the agreement, are erroneous because they are contrary to the pretrial order.

The issues in this matter were fully developed by both sides during the trial (*Haseltine* v. *Haseltine*, 203 Cal. App.2d 48 [21 Cal.Rptr. 238]). We think that the pretrial conference did set up all of the issues that were involved, and in *Fitzsimmons* v. *Jones*, 179 Cal.App.2d 5, 9 [3 Cal.Rptr. 373], where pretrial procedure is discussed, the court declared the issues, "One The amount, if any, due plaintiff from defendants" and "Two The amount, if any, that should be awarded defendants on their Cross-complaint" would be sufficient. Here, among the remaining issues, we have a similar statement plus the words "under his complaint."

Appellant did request modification of the pretrial conference order, which was made, and could have requested further changes had he so desired (*Baird* v. *Hodson*, 161 Cal.App.2d 687, 689 [327 P.2d 215]).

The court, in *Vaughn* v. *Jonas*, 31 Cal.2d 586, 605 [191 P.2d 432], said, "A party cannot permit an issue to be litigated and on appeal escape the consequences by claiming that such issue was not pleaded." Therefore, it would appear to us that the pretrial order sufficiently covered all of the issues that were involved on trial of this matter.

Appellant claims that impossibility must be proved first before a reasonable time for the performance by the obligee would be determined, as stated in *Bank of America* v. *Engleman*, 101 Cal.App.2d 390, 394 [225 P.2d 597] : "It is the law that where an event has been named as a time for the payment of money and such event can never occur, a reasonable time is by implication fixed as the maturity date of the promise to make payment." (See also *Estate of Baird*, 59 Cal.App.2d 303 [138 P.2d 698] ; and *Bartholomae Oil Corp.* v. *Oregon Oil etc. Co.*, 106 Cal.App. 57 [288 P. 814].)

Appellant consistently maintains that a clearance does exist, that it has a technical meaning to persons in the securities business, but claims that it was error for the court to sustain objections as to individuals attempting to define what a clearance was on the grounds that such is a question of law. Efforts to obtain a definition from appellant at oral argument were without avail in that appellant's definition of "clearance" was that it is a "word of art."

We have carefully read all of the Securities and Exchange Commission regulations in volume 3 of Federal Securities Law Reporter, paragraphs 68,201 to 68,207 (17

Code Federal Regulations, part 202; 11 Federal Register 177A-729, §§ 202.1 to 202.7). As we read these sections, they refer to the filing of registration statements as are authorized under the Securities Act of 1933 as particularly set forth in United States Code Annotated, title 15, section 77s.

The word "clearance" is not found in any of the definitions under the rules and regulations of the Securities and Exchange Commission, nor does appellant cite its use in any of his citations of the law. We have been unable to find a definition for this word as far as securities are concerned, in Words and Phrases, or any other book or dictionary.

Section 1861 of the Code of Civil Procedure states: "The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they have a local, technical, or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement must be construed accordingly."

It is said in *Ermolieff* v. *R.K.O. Radio Pictures*, 19 Cal.2d 543, 552 [122 P.2d 3], quoting from Restatement, Contracts, section 248, page 352, regarding custom or usage: " 'Where both parties to a transaction are engaged in the same occupation, or belong to the same group of persons, the usages of that occupation or group are operative, unless one of the parties knows or has reason to know that the other party has an inconsistent intention.' "

We think, for the reasons stated herein, that the word "clearance" was ambiguous and that the trial court had the power with which to find as it did.

Code of Civil Procedure section 1856 sets forth the rule as to agreements reduced to writing and the exclusion of parol evidence; section 1860 sets forth the construction of instruments; and section 1861 refers to admitting evidence where the terms of a writing have a "local, technical, or otherwise peculiar signification."

Inasmuch as the term "clearance" apparently does not exist, its meaning between the parties can be gone into by the court, as was done here, to ascertain the "technical" or "peculiar signification."

In *Ribiero* v. *Dotson*, 187 Cal.App.2d 819, 821 [9 Cal.Rptr. 909], the court said: "Also, when the language of a contract is fairly susceptible to one of two constructions (i.e., when it is ambiguous) extrinsic evidence may be considered 'not to

vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties.' "

The offering circular, executed by appellant, Thomas Leo Cleary and William A. Crocket and Dora L. Hopkins, indicates on its "face" that it is exempt from registration, being under $300,000 (15 U.S.C.A. § 77c, subd. (b)). We find nothing in the rules and regulations which would add to the amount previously sold and not exempt the very resale of that stock so that, together, such would exceed $300,000 and be now subject to registration with the S.E.C.

Appellant contends that he, having been an underwriter of this issue, could not sell his own stock which he obtained under that issue without this so-called "clearance."

While section 77e, title 15 of the United States Code Annotated, relates to offerings in excess of $300,000, section 77d provides that the above section does not apply to transactions by any person other than an issuer, underwriter, or dealer, except as to transactions taking place prior to 40 days after the security was offered to the public by an issuer or by an underwriter. In other words, had the offering which was made November 18, 1954, been in excess of $300,000, then the offering circular or prospectus would have had to have been filed through and registered with the Securities and Exchange Commission under the regulations as mentioned above and then a former underwriter who sold all of the stock issue would have to wait 40 days before he, personally, could sell his own stock. This, however, would not apply to any unsold securities by the corporation.

In any event, whether the stock was exempted or was not exempted, the 40-day limitation would have expired long before appellant borrowed the money from respondent. The appellant was not an underwriter because he and his partner had sold all of the stock as underwriters but he, as an individual, and Bailey & Company, did buy stock but not as a subscriber.

It cannot be said that appellant was a person in control within the meaning of the regulations of the S.E.C. because at the alleged due date of the note and option he was no longer the underwriter, a subscriber, or a director, having failed to be reelected to the board of directors in October 1955. Sandell became an appointed director in February 1955.

As to the matter of "clearance," if it does exist it would not be required under these facts because of the regulations

of the S.E.C., and a finding would be unnecessary in view of the other findings.

Mr. Cross, an expert on the S.E.C. regulations, testified in general that the technical meaning of the word "clearance" is doing whatever is necessary concerning sale of shares without violating any of the provisions of the Federal Securities Act of 1933.

The appellant also testified that the term "clearance" generally meant using the registration of the company or getting a registration of his own or to comply with the regulations of the S.E.C. It might also be easily said that inasmuch as such a clearance is not required by the S.E.C. regulations, that automatically the person selling the stock has a clearance to do anything he wishes with his stock at any time.

The appellant, not waiting for any so-called "clearance," actually sold under the offering circular of November 18, 1954, 1,500 shares of stock on December 8, 1955, to Mr. Sandell at the price of $10.50 a share. This was under the option to Mr. Sandell and so exercised, in spite of the clause in the option that provided for the option to become effective on November 19, 1955, or as soon thereafter as clearance was granted from the S.E.C. As admitted by appellant in his answer and which is also set forth in the contentions in the pretrial order, as well as by appellant's counsel at oral argument, the option was exercised and the stock is now in escrow in Mr. Sandell's name. It is difficult for us to understand the appellant's claim of the necessity of a "clearance" when he actually had transferred this very stock in December 1955 before the note was due.

We think that appellant could have sold this stock at any time without any action on his or respondent's part and it was unnecessary to make a finding on "impossibility."

The court found that the shares of stock at the time of the giving of said option or any time thereafter had no real or demonstrable value or any market value in excess of $10.50 per share; that the option had no monetary value, that it is impossible to give a value to it and there was at the time of the giving of the option no value to it which would constitute an interest rate on said loan of more than 10 per cent per annum.

 Appellant, in setting up the special defense of usury, assumes the burden of proving whether or not usury exists, as it is never presumed (*Traders Credit Corp.* v. *Thyle,*

116 Cal.App. 252 [2 P.2d 568]). Appellant did not carry this burden.

Charter v. Olson, 137 Cal.App.2d 636, 637-638 [290 P.2d 867], reestablishes the rule that before the appellate tribunal can reverse a judgment on the ground of insufficiency of the evidence, every favorable inference and presumption which may fairly be deduced from the evidence shall be resolved in favor of the prevailing party.

The appellant has testified that this option was worth $60,000, and has outlined several sales which were made by him as a broker to his clients in excess of $10.50 per share; has referred to an option which he gave to President Cleary in 1956 to purchase stock for $35 per share (however, this in fact was never exercised); that some stock was sold by him at $30 per share, other stock at $20 per share in December 1955. Mr. Crocket, a director of the corporation, testified that at one time he believed the stock might have had a speculative value of $50 per share, but he also testified that he was not interested in figuring whether it was worth $10 a share or $6 or $20, as he wasn't interested in buying any more, even at the price of $10.50 per share.

Mr. Orchard, one of the directors and a former client of appellant, testified that he bought similar stock of the corporation at the time of this option at $10.50 per share but his opinion was that the stock was worth about half that much.

Appellant has also referred to the conduct of the persons closely connected with the company, such as Mr. Sandell's conduct in testifying that even though the stock was never worth more than $5 or $6 per share, he loaned $40,000 in February 1955 to the company on the basis of exercising his preemptive rights and that he had bought other stock at $20 per share but testified that he did that to keep Mr. Cleary active in the company.

Without merit is appellant's claim that there were possible different valuations of the stock as evidenced by executive meetings of a few members of the board in August 1955. The discussions about a four-way stock split to be sold at $10.50 per share were pure speculation as to what the board of directors might do in the future and have no relation to the valuation of the stock at the time the option was given.

In *Estate of Spitly,* 124 Cal.App. 642, 645 [13 P.2d 385], quoting from *Heiner* v. *Crosby,* 24 F.2d 191, it is said: " 'Sales made at a particular time and place may be significant but the price paid is not necessarily decisive of fair market price

or value. The fact of sales, in itself and without regard to the circumstances under which the sales were made, does not conclusively establish either statutory fair market price or value. Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market may neither signify a fair market price or value, nor serve as a basis on which to determine the amount of gain derived from the sale.' ''

We think that the court, after hearing all of the evidence presented by the appellant and the evidence by the respondent, properly found that the option had no value at the time the option was given upon which the charge of usury could be made. A close examination of the financial statements and minutes and records of the corporation indicates that the appellant had been a stockholder and director of this corporation prior to November 1954; that he was a director at the time he took part in obtaining the offering permit of November 18, 1954, from the California Division of Corporations and in issuing the offering circular; that he also was the underwriter who handled the offering; that he was a director at the time that he signed the offering prospectus and that Mr. Sandell did not become a director until February 1955. In other words, the appellant had much more information as to the condition of this company prior to Mr. Sandell's becoming a director; he knew the financial condition of the company as is particularly shown by the California Corporations Permit of October 1954 (see Corp. Code, § 831; *Austin* v. *Hallmark Oil Co.*, 21 Cal.2d 718, 729 [134 P.2d 777]), which permit further shows that originally there were 20,000 shares of stock issued and that the net worth of the company was $22,814.75; and in the offering prospectus of November 1954, where the information is given as to what the funds were to be used for, it also shows that the appellant was to receive a great deal of the money in repayment to him of substantial loans to the corporation and 10 per cent commissions, and after paying all these debts off there would still be left only $21,000 for further use by the company, with the capital liability of the corporation being extended an additional amount of nearly $300,000. There is no doubt that this corporation was in financial distress and shareholders who were advancing moneys to the corporation and exercising their preemptive rights to purchase additional shares at $10.50 per share were only doing so in the hopes of saving the corporation and ultimately "striking it rich."

While the appellant constantly maintains that the financial statements do not really show the future possibilities of the company or its potential success in operating its various oil leases, we can only further note that subsequent to the financial statements, in November 1954, the company went from bad to worse. Subsequent balance sheets show that additional money was subscribed to the company in which the capital stock ultimately became listed at $900,000, assets were $918,-573, and liabilities were $917,544, and the company had a deficit statement in that particular year, 1956, of some $966,448 and according to the statement, had two lawsuits against it in which the amount claimed was $477,000 plus other contingent liabilities, and had a loss of $43,484.32 for 1956.

One of the statements of Cleary Oil Company Limited lists as an asset the sum of $436,000 which is due from its subsidiary which, itself, was insolvent and was overdrawn at the bank at that time. The company's profit and loss statements for various years after 1955 indicated constant, continual deficits in its operation.

Considering the evidence of transactions in options, evidence of transactions in this unlisted stock, opinion evidence and conduct of the persons giving opinion evidence on the condition of the corporation, the court properly made its finding that the option had no value and that the stock was not worth in excess of $10.50 per share. Any information which was later acquired by Mr. Sandell after becoming a director and later, president, would not, in this court's opinion, relate back to indicate that at the time the option was given this stock had any value. All of the stockholders naturally had a confident feeling that ultimately the stock would be valuable and all hoped that the future would be better than the past.

While it is true that a bonus paid for the making of a loan must be considered as interest in arriving at whether or not there is usury (*Otis* v. *I. Eisner Co.*, 7 Cal.App.2d 496, 499 [46 P.2d 235]), we do not think here that there was any bonus whatsoever as consideration for the loan, that the appellant was merely anxious to invest more money in this company in spite of its financial condition, and that he wanted this loan so that he could pick up his preemptive rights shares at $10.50 per share, and what movement of stock there was was purely on the basis of various interested members trying to gain a position in the company either as president, director and stockholder or salesman. Though

this contract is not usurious on its face, the question of intent to evade the law is a necessary and vital element and must be proven affirmatively in order that usury may be found (*Moore* v. *Dealy,* 117 Cal.App.2d 89, 94 [254 P.2d 888]), which appellant did not prove.

In *Helvering* v. *Tex-Penn Oil Co.,* 300 U.S. 481 [57 S.Ct. 569, 81 L.Ed. 755], the court affirmed a judgment where the shares were regarded as highly speculative and where a sale thereof was impossible but not having a fair market value capable of being ascertained with reasonable certainty.

While Mr. Sandell bought stock from the president of the company, Mr. Cleary, at a price in excess of $10.50, his testimony was that he did so in order to keep Mr. Cleary active in the company inasmuch as Mr. Sandell felt that the company needed his knowledge in handling the affairs in Canada.

The value of the stock after the date the option was given is immaterial even though it may later become valuable. (See *Schiff* v. *Pruitt,* 144 Cal.App.2d 493 [301 P.2d 446].)

The lender is charged with the value of property at the time he receives it regardless of what is later received from the sale of it (*Calimpco, Inc.* v. *Warden,* 100 Cal.App.2d 429, 448 [224 P.2d 421]). Mr. Sandell received the option on April 15, 1955, and its value, if any, is to be ascertained as of that date.

The judgment is affirmed.

Stone, Acting P. J., concurred.

Conley, P. J., deeming himself disqualified, did not participate.

A petition for a rehearing was denied March 11, 1963. Conley, P. J., being disqualified, did not participate therein. Appellant's petition for a hearing by the Supreme Court was denied April 9, 1963.