[Civ. No. 10651. Third Dist. Dec. 3, 1963.]

JOSEPH ORTIZ, Plaintiff and Appellant, v. AUGUSTINE AVILA et al., Defendants and Respondents.

Lynn Carman for Plaintiff and Appellant.

Milham, Byrne & Hamilton for Defendants and Respondents.

PIERCE, P. J.—Defendants, Augustine and Mercy Avila, are ranchers in El Dorado County. Plaintiff, Joseph Ortiz, came to live with them in January 1956, remaining until July 1961. The status of moneys delivered by plaintiff to defendants during this period is the subject of the controversy. The theory of the complaint was that plaintiff, who was a person of subnormal intelligence, had delivered his paychecks to defendants; that he "reposed special trust and confidence in defendants"; that defendants agreed to act as plaintiff's agents, representing they would open and maintain a bank account in his name into which these paychecks would be deposited. It is alleged that the representation which plaintiff relied upon was false and fraudulent, that plaintiff had periodicallly delivered to defendants sums over the years totaling $12,000 which defendants appropriated to their own use. Defendants' answer denied the confidential relationship, the agreement, the representations and any misappropriation of money. Their pretrial statement alleges that all earnings of either plaintiff or defendants were to be placed in a common fund for "the common support and welfare of plaintiff and defendants," and they allege that they *were* so used.

The case was tried to the court, which accepted defendants' version of the agreement. Its judgment was that plaintiff take nothing. Plaintiff appeals on a settled statement, his principal contention being that the evidence did not support the judgment. His second contention is that the court erred prejudicially in refusing his request for special findings, among which was a request that the court find a confidential relationship existed between defendant and plaintiff. This second contention is sound. Explanation of the reason requires a résumé of the facts.

In the record before us, the settled statement, a narrative account of the testimony is given from which we glean the following:

Plaintiff (hereinafter "Joe") is a man over 50 years of

age with a second-grade education and not very bright. He can sign his name and read a little. Defendant, Augustine Avila, had known Joe since he, Augustine, had been a small boy. Mercy Avila had known Joe since her marriage to Augustine. Augustine "regarded Joe as a brother, wanted Joe to regard him as a brother."

In 1955 Joe had been living with Augustine's father in Kern County and was unemployed. On a visit of Augustine and his wife to the father's home during the holiday season, an arrangement was made whereby Joe would go to El Dorado County to live with the Avilas where he would "be treated as a member of the family." Augustine promised to take care of Joe as long as he lived and give him a "decent funeral." He told Joe he thought he could get him a job.

Joe immediately went to live with the Avilas. For the first six months Joe did not have a steady job and his only contribution to the family living expenses was his earnings from odd jobs and the proceeds of his unemployment checks. Joe's total earnings during this period were $170. He had no other money, had brought none with him. The Avilas supported him. Meanwhile, Augustine was training Joe at the Wetzel-Oviatt Lumber Mill where Augustine worked. After two months of training, he recommended Joe to the foreman and Joe was given a job. He worked there steadily thereafter cleaning out ashes in the boiler room. His wages appear to have been approximately $250 per month paid in two monthly installments.

Joe testified that after he got this steady job, "it was his understanding" that the checks received on the 10th of the month from the mill were paid to defendants for room and board, but that those received on the 25th of the month were to be "turned over to Mercy Avila for deposit by her in a bank account in his name on his behalf." How he obtained this understanding is not in the record, nor are we informed what, if anything, he did to impart his belief to the Avilas. They denied any such arrangement.

Augustine and Mercy maintained a family joint bank account in a bank at Ione; this had been in existence when Joe came to live with them. Both testified that Joe's paychecks were deposited into this account. No evidence was produced either by plaintiff or defendants as to the extent of other deposits. All family expenses were paid out of the account, including $1,000 on a mortgage on the ranch. The narrative statement of Mercy Avila's testimony says: "She [i.e.,

Mercy] always made out the checks after supper at the dinner table and Joe had generally been there, and she would say to Joe, is it all right if we pay so-and-so, and he would say, sure, go ahead. That Joe knew at all times that he had no account at any bank and that he knew how the money was being spent."

Defendants' testimony was that during the five and one-half-year period Joe continued to live with the Avilas, he was treated as a member of the family. He was referred to as "Uncle Joe" by the five Avila children. A witness produced by plaintiff testified "[t]hat the treatment of Joe given by the Avilas was not the best. That at one time Joe lived in an outside shack without running water and with an outside privy, and the roof leaked. Another time Joe lived in a trailer. Joe built a cabin on the Avila property but did not live there." Joe in his testimony did not complain of his treatment. He said he "was treated as a member of the family."

A truck was purchased for Joe by Augustine who furnished all gasoline for its use. The Avilas took out accident and health insurance for Joe and a burial insurance policy, all premiums therefor being paid by them. They also paid Joe's other medical bills. They bought all of his clothing and articles to meet his other personal needs; they opened an account for him at a local store where he charged what he needed to the Avilas. The Avilas from time to time also suggested to Joe that they withdraw and give him money from the bank account, but he always replied, "What do I need money for?" Joe also maintained an account at a company store, his bill thereat being paid by deductions from his wages.

After Joe had lived with the Avilas for about a year, Augustine reaffirmed his promise and obligation to Joe to care for him for life. Joe confirmed that this statement had been made and said that when it was made he remained silent.

In the summer of 1961 for no reason that is apparent in the record (and Joe's testimony assigned no reason), Joe left the Avilas' residence. It is significant that when questioned by the judge he admitted he had made no demand for his now-alleged bank account—no demand was ever made except in the complaint filed.

Augustine and Mercy both testified to their willingness to carry out their promises to Joe, said that they would still

take him back into the family fold and care for him until he died if he would return.

Upon receiving this evidence, the parties having rested and counsel having argued, the court stated its opinion that there was no fraud; no evidence that the Avilas had told plaintiff they would open a bank account in his name or deposit any money into such an account. The court stated further that plaintiff's testimony had merely been that this was his belief, but he never communicated this belief to the defendants. The judge also stated there had been a valid life-care contract under which "it was plain that what the parties had done here was to contribute their earnings into a common fund for the benefit of all."

Findings prepared followed this theory. The court found that there were no false or fraudulent representations; that the parties had orally agreed that plaintiff would live as a member of defendants' family, which he had done from 1956 until the middle of 1961; "that the earnings of plaintiff and defendants were considered by the parties to be used for the common use of plaintiff and defendants"; that the earnings of both were placed in a bank account; that defendants supported plaintiff, paid plaintiff's bills from this account; that they offered plaintiff money therefrom which plaintiff refused and plaintiff had never demanded or even asked for any money; that no money was due from defendants to plaintiff. The court made no finding on the issue of the confidential relationship.

Plaintiff contends there was no evidence to support the finding that the parties created a common fund. The contention seems to rest upon the proposition that the existence of such a fund could not be found without proof by defendants of the amounts deposited into the fund by them and without an accounting of the withdrawals for plaintiff's benefit.

There was, however, other substantial proof of the "common fund for a common use" theory, which the acts of the parties over the years seem to confirm, and therefore we, as a reviewing court, are unable to say the trial court was unjustified in accepting this evidence.

On the other hand, a finding properly requested on a material issue was refused and because of such refusal we are unable to ascertain what the court's conclusion on fraud and its holding would have been had the facts not included in the findings been stated.

After judgment and as a part of his motion to vacate, plaintiff made a written request for specific findings on the following issues (*inter alia*) : Was the plaintiff of subnormal intelligence? Were defendants in a confidential relationship with plaintiff? These were issues raised by the pleadings and they were material. They were particularly material because of the following rules of law:

■ As a general rule, fraud is not presumed and he who asserts that fraud has been committed has the burden of proving it. (23 Cal.Jur.2d, Fraud and Deceit, § 73, p. 182, and cases cited.) There is, however, an exception to the rule which in California is statutory. Civil Code section 2235 in effect when the transactions herein involved occurred provided as follows:

"All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence."

In *Bradner* v. *Vasquez*, 43 Cal.2d 147, it is stated by the court (at p. 152 [272 P.2d 11]) :

"When a fiduciary enters into a transaction with a beneficiary whereby the fiduciary's position is improved, or he obtains a favorable opportunity, or where he otherwise gains, benefits, or profits, it may fairly be said that an advantage has been obtained. To declare that the advantage obtained must be shown to be unfair, unjust, or inequitable before the presumptions arise would result in the imposition of a condition which is not required by section 2235." (See, also, *Rader* v. *Thrasher*, 57 Cal.2d 244, 250 [18 Cal.Rptr. 736, 368 P.2d 360].)

To state the rule of these cases in simplest terms, a holding that a presumption does not arise until an unfair advantage is proved would be tantamount to saying that before a statutory presumption of fraud can be applied the court would have to find that actual fraud existed.

■ Under the evidence there can be no doubt that plaintiff was a person of subnormal intelligence and also no doubt that a fiduciary relationship existed between plaintiff and defendants. Both facts were admitted by defendants in their testimony. It is also clear that the contract, or arrangement, between the parties under which plaintiff over the years delivered almost his entire paycheck, a total of over

$12,000, to defendants placed them in a position to gain an advantage over plaintiff. Code of Civil Procedure section 634 as amended in 1959 (Stats. 1959, ch. 637) contemplates that a request for special findings on material issues can be made "either prior to the entry of judgment or in conjunction with a motion under section 663 of this code." A motion under said section was made here and a request for these findings was made in connection therewith. It was therefore made seasonably.

In fairness to the trial court, it should be stated that neither Civil Code section 2235, nor *Bradner* v. *Vasquez, supra,* nor *Rader* v. *Thrasher, supra,* appears to have been cited in support of the request for special findings; and, in fact, none of these authorities was cited to us on the appeal.

But special findings on this issue were required, they were refused, and the failure to make them must be regarded as prejudicial since we cannot tell whether or not the trial court, in weighing the evidence, gave heed to the presumption of said Civil Code section 2235. The case must therefore be reversed.

Under the rules stated, the confidential relationship having been established, the burden was upon defendants to prove that no unfair advantage had been taken of plaintiff. One way would have been to produce the bank records showing what defendants had contributed to the common fund and what portion of the withdrawals were for the common purpose. This was not done. This is not to say, of course, that proof by defendants that they had matched deposits into the fund and had not withdrawn a greater amount for their own use than was spent for plaintiff's benefit, is the only way they could overcome the presumption of undue influence and insufficient consideration. Any other evidence sufficient to satisfy a reasonable mind would suffice. But here we cannot determine whether the court considered the presumption and believed it had been overcome, or just disregarded it.

Since the case must be retried, we should note briefly plaintiff's complaint that other findings requested were not made. The list is long and need not be stated in detail. Some findings requested were evidentiary in character. The rule is that findings are required of ultimate, not evidentiary facts. (2 Witkin, Cal. Procedure, Trial, § 112, p. 1843.) Some of the findings requested would only have stated the opposite to be untrue of a fact found to be true. This is unnecessary. (Witkin, *op. cit.,* Trial, § 118, p. 1850.) Some relate to issues

which became immaterial after other findings had been made which were determinative of the case. (*Virtue* v. *Flynt,* 164 Cal.App.2d 480, 484 [330 P.2d 879] ; *Sandell, Inc.* v. *Bailey,* 212 Cal.App.2d 920, 927 [28 Cal.Rptr. 413] ; *Devers* v. *Greenwood,* 139 Cal.App.2d 345, 351 [293 P.2d 834].)

The judgment is reversed.

Schottky, J., and Friedman, J., concurred.